John ALSTON, et al.

v.

Bishop L. ROBINSON, Secretary,
etc., et al.

BARTHOLOMEY, et al.

v.

Bishop L. ROBINSON, Secretary,
etc., et al.

Civ. Nos. K–89–1866, K–89–2415.

United States District Court,
D. Maryland.

March 31, 1992.

Witold J. Walczak, Pittsburgh, Pa., and Emily M. Rody, Baltimore, Md., for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Lawrence H. Norton, Asst. Atty. Gen. of Maryland, for defendants in Civ. No. K–89–1866.

J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Maureen M. Dove, Asst. Atty. Gen. of Maryland, for defendants in Civ. No. 89–2415.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiffs in the within actions are inmates at Patuxent Institution (Patuxent), a Maryland prison facility, who challenge the constitutionality of the December 1, 1988 suspension of Patuxent's work release and leave programs, the revocation of certain Patuxent inmates' work release statuses and/or the application to some of those inmates of certain March 20, 1989 amendments to Patuxent's enabling legislation.

Plaintiffs in *Alston v. Robinson* were all participants in Patuxent's work release program prior to December 1, 1988.[1] They sue under 42 U.S.C. § 1983[2], and 28 U.S.C. §§ 2201 and 2202, seeking declaratory, injunctive[3] and monetary relief[4] against the Secretary of the Department of Public Safety and Correctional Services and officials at Patuxent.[5] Plaintiffs contend that the procedures employed by state officials to suspend their work release statuses and to determine whether to reinstate plaintiffs

1. These plaintiffs number twenty-eight and are the following: John Alston, Rocky Adkins, Dennis Barr, George Boyd, Robert Cordle, Bruce Creasy, Charles Doyle, Jeffrey Edley, Clarence Ford–Bey, Anthony Goines, Clarence Hancock, John Holmes, George Isabell, Jon Lowans, Kenneth Mercier, William Mitchell, Roger Osborn, Raymond Poellot, Michael Pollock, Clifton Rorie, Thomas Sikalis, George Standford, Richard Sutton, Michael Timlin, Clifton Vanmeter, Lewis Walker, Jesse West and Regenault Wright–El. Some of these plaintiffs had been employed in the Baltimore community, while on work release leave, for as long as six years prior to December 1, 1988.

2. Plaintiffs in both actions premise jurisdiction upon 28 U.S.C. 1343(a)(3) and (4).

3. Plaintiffs ask this Court to order the Secretary and the Acting Director at Patuxent to reinstate them into the work release program, to assist them in securing employment comparable to the jobs they held prior to December 1, 1988,

and to afford them all the rights and privileges which they enjoyed prior to December 1, 1988.

4. Plaintiffs seek nominal and compensatory damages, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and costs pursuant to Federal Rule of Civil Procedure 54(d).

5. Plaintiffs in *Alston* sue in their official and individual capacities defendants Bishop L. Robinson, Secretary of the Maryland Department of Public Safety and Correctional Services, and Robert Johns, Acting Director of Patuxent and a member of the Patuxent's Board of Review as of late January, 1989. Plaintiffs sue in their individual capacities only Norma Gluckstern, Director of Patuxent and Chairman of Patuxent's Board of Review until late January, 1989; John Murry and Frank Eisenberg, Associate Directors of Patuxent and members of Patuxent's Board of Review; and Edward Tomlinson, Minor Crager, Stella Hargett, appointed members of Patuxent's Board of Review until late January, 1989.

violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution and that the decisions not to reinstate plaintiffs' work release statuses [6] were arbitrary and capricious, also in violation of the Due Process Clause. Plaintiffs further claim that the decisions of certain of defendants to suspend and not to reinstate plaintiffs' work release statuses, and the 1989 Maryland law, Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218, which conferred upon the Secretary of the Department of Public Safety and Correctional Services sole authority to determine plaintiffs' reinstatement, violate the *ex post facto* clause of the United States Constitution.[7]

Plaintiffs in *Bartholomey v. Robinson* [8] were inmates who were, on or before March 20, 1989, either "eligible" for treatment at Patuxent, or physically present at Patuxent while being evaluated or awaiting evaluation for eligibility at Patuxent. Invoking 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202, the *Bartholomey* plaintiffs seek to enjoin [9] and have declared violative of the *ex post facto* clause the retroactive application of certain provisions of the 1989 amendments to Patuxent's enabling statute which plaintiffs claim make more difficult the securing of parole, work release and leaves of absence than was the case at the time of their offenses or their admission to Patuxent.[10] Plaintiffs in *Bartholomey* claim that the retrospective application of the following 1989 amendments [11] to Article 31B of the Maryland Code is *ex post facto* and therefore uncon-

6. At the time of the filing of the amended complaint on August 9, 1989, Secretary Robinson had evaluated only sixteen inmates under Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218 and had denied reinstatement as to all of those inmates. Of the original twenty-eight inmates suspended from the work release program, only two regained work release status as a result of the reinstatement hearings. As of May 18, 1990, five of the original twenty-eight Alston plaintiffs had been restored to work release, namely, Boyd, Edley, Poellot, Sikalis, and Timlin.

7. Pursuant to an agreement between counsel for all parties in *Alston* and *Bartholomey,* this Court Ordered on June 1, 1990, in both cases, that the following issues raised by plaintiffs be briefed: (1) whether continuing secretarial review of work release and leave decisions of *Alston* plaintiffs violates the *ex post facto* clause and/or the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (2) whether the application of the 1989 Maryland law violates the *ex post facto* clause; and (3) whether the fact that Patuxent's past procedural practices will not be utilized in future work release hearings violates the plaintiffs' federal due process rights. *See also* note 12 *infra.*

Plaintiffs amended complaint in *Alston* further alleges that the refusal of state and Patuxent officials to permit plaintiffs to attend any religious ceremonies or to go outdoors for recreation between December, 1988, and June, 1989, constituted cruel and unusual punishment in violation of the Eighth Amendment as applied to the states by the Fourteenth Amendment of the United States Constitution. Plaintiffs have failed to brief or to pursue that Eighth Amendment claim in any of the pleadings or memoranda filed to date. This Court, therefore, dismisses that claim, without prejudice, for lack of prosecution pursuant to Federal Rule of Civil Procedure 41(b).

8. These plaintiffs are Joseph Bartholomey, James Miller, Jeffrey Edley, John Emge, and Richard Wilson.

9. In addition, those plaintiffs seek reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and costs pursuant to Federal Rule of Civil Procedure 54(d). In *Bartholomey,* plaintiffs do not seek any damage awards.

10. In *Bartholomey,* plaintiffs sue, in their official capacities, Bishop L. Robinson, Secretary of the Maryland Department of Public Safety and Correctional Services; Joseph Henneberry, Director of Patuxent Institution and a member of the Patuxent's Board of Review, as of September, 1989; and the other members of the Patuxent Institution Board of Review constituted after the enactment of the 1989 amendments, namely, Kenneth Taylor, Devon Brown, Dr. Denise Holland, Edward Tilghman, Fred Steffans, Carol Henley, Arthur Marshall and Byron Sedgewick.

11. Although challenged by the plaintiffs in *Bartholomey* in their Amended Complaint, the application of the following amendments is no longer at issue in this case because state officials have agreed to apply those amendments prospectively only: §§ 1(f)(1)(v) and (f)(2)(iii), § 4A(c)(1), and § 8(a) which create additional requirements to qualify as an "eligible person" for Patuxent Institution; §§ 11(b)(4) and (5) which require that certain inmates serve minimum sentences before becoming eligible for parole; and § 11(d) which requires the Secretary of Public Safety and Correctional Services to approve the parole of an individual from Patuxent. The parties have stipulated that prospective application as implemented by defen-

stitutional: (1) § 6(c)(2) which requires that seven members of the Board of Review approve all decisions granting parole, work release or leaves of absence; (2) § 11(b)(2) which states that the Board of Review "may," rather than "shall," grant parole upon its determination of certain factors; (3) §§ 11(c) and 10(b), which provide that the Board of Review shall give victims notice of the possible parole, work release or leave of absence of their offender and a reasonable opportunity to comment upon that possible furlough before the Board decides to grant such liberty; and (4) the state's policy of authorizing and/or requiring, under Article 41, § 4–104(c) and Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218, the Secretary to review and approve all of the Board's decisions to grant work release or leave.[12]

## I. PROCEDURAL HISTORY

The *Bartholomey* action was commenced on August 23, 1989. Thereafter, the parties in *Bartholomey* filed cross-motions for summary judgment on the basis of stipulated facts and agreed that there are no genuine issues of material fact remaining. On June 23, 1989, plaintiffs in *Alston* filed their complaint and moved for a preliminary injunction reinstating them into the Patuxent work release program and restoring to them all of the privileges which they enjoyed prior to December 1, 1988. This Court, on October 11, 1989, determined to hold that motion *sub curia.* Defendants in *Alston* filed a motion for summary judgment on August 2, 1989, and then a supplemental motion for summary judgment on August 23, 1989, after plaintiffs amended their complaint on August 14, 1989.

In September and October of 1989, twenty-three of the original twenty-eight *Alston* plaintiffs filed timely individual Appeals and Petitions for Reversal of Administrative Agency Action, pursuant to Maryland's Administrative Procedure Act (APA), Md. State Gov't Code Ann., § 10–215, *et seq.*, in the Circuit Court for How-

---

dants is not keyed to the time of an inmate's offense, but rather, means that a new provision is applied only to those inmates who were not physically present at Patuxent on March 20, 1989, the effective date of the 1989 amendments. While that might mean that persons sentenced prior to that effective date could assert *ex post facto* claims if they, subsequent to that date, have been, are or will be confined at Patuxent, that issue has not been presented, and therefore is not considered herein.

**12.** Defendants contend that the issue of secretarial approval of work release and leave status for inmates whose offenses were committed before March 20, 1989, is not at issue in *Bartholomey.* Defendants argue that that issue is not raised in the Complaint or First Amended Complaint in *Bartholomey,* but rather, is raised by plaintiffs in *Alston;* that the provisions dictating secretarial approval of work release and leave apply only to the select group of plaintiffs in *Alston;* and that *Bartholomey* concerns an *ex post facto* challenge to broad changes in the future management of Patuxent, whereas *Alston* focuses upon the treatment of a small group of Patuxent inmates who were already on leave status in December, 1989. *See* Letter by counsel to this Court dated May 29, 1991. This Court concludes that the issue of whether required secretarial approval of work release and leave status of Patuxent inmates constitutes an *ex post facto* violation is properly before this Court in both *Alston* and *Bartholomey.*

Defendants' counsel, in a letter to plaintiffs' counsel dated June 8, 1990, informed the latter that Secretary Robinson did not intend to single out the work release of *Alston* plaintiffs for review, but rather "is reserving the discretion conferred by statute to review work release decisions as to *all* future cases" (emphasis in original). The Secretary's statement makes clear that the issue of secretarial approval of future work release and leave status affects named plaintiffs in both *Bartholomey* and *Alston* and constitutes a broad change in the future management of Patuxent. Moreover, plaintiffs' counsel objected to secretarial review on *ex post facto* grounds already briefed in *Bartholomey* and, in response, this Court, on June 1, 1990, Ordered that that issue be "briefed by counsel as part of the memorandum of law to be filed in *Bartholomey v. Robinson.*" The record also shows that in a telephone conference on June 1, 1990, both counsel agreed that they understood the issue of secretarial review of work release and leave to be raised in both *Alston* and *Bartholomey.* Furthermore, in a joint letter dated May 29, 1991, all counsel agreed to submit that issue based upon the pleadings filed to date, in the event this Court deemed that issue properly alleged in *Bartholomey.* Under those circumstances, Federal Rule of Civil Procedure 15(a) would certainly allow plaintiffs in *Bartholomey* to amend their complaint to include the issue of secretarial approval of work release and leave. Accordingly, this Court will consider that issue properly raised in both *Bartholomey* and *Alston.*

ard County, Maryland. In that state court action, certain of the *Alston* plaintiffs questioned Secretary Robinson's decision not to reinstate them into Patuxent's work release program, on the grounds that that decision was based upon factors related to retribution and general deterrence, in violation of the *ex post facto* clause of the United States Constitution, and Article 17 of the Maryland Declaration of Rights, and also was arbitrary and capricious and an *ultra vires* act, in violation of Maryland law.

Secretary Robinson, moving to dismiss those appeals to the Howard County Circuit Court, asserted that Maryland's Administrative Procedure Act did not confer subject matter jurisdiction on that state court to consider those appeals because the reinstatement proceedings before the Secretary were not "contested cases" within the meaning of § 10–201 of the Act.[13] On December 6, 1989, the twenty-three plaintiffs, whose Howard County cases had been consolidated and styled, *Holmes v. Robinson,* in opposing the Secretary's motion to dismiss, maintained that their action was a "contested case" over which the state court had jurisdiction because "Patuxent's regulations and the Due Process Clauses of the United States and Maryland Constitutions all require that the determination to revoke or continue work release be made after a hearing."[14] In their opposition to the Secretary's motion to dismiss, the *Holmes* appellants contended that under the due process clauses of both the United States and Maryland Constitutions, "Patuxent's regulations, work release agreements signed by Appellants and the Institution, past practices and explicit institutional policy pronouncements created a protected 'liberty interest' in remaining on work release ... which could not be taken

away without procedural protections, including a hearing."[15]

On February 7, 1990, the Circuit Court for Howard County granted the Secretary's motion to dismiss in a summary Order concluding that Maryland's Administrative Procedure Act did not confer jurisdiction on that court to review the Secretary's reinstatement decisions. On appeal to the Court of Special Appeals of Maryland, the twenty-three *Alston* plaintiffs argued that both Patuxent's regulations and the Due Process Clause of the Fourteenth Amendment of the United States Constitution required an agency hearing to be held before their work release status could be revoked and that their appeal, therefore, concerned a "contested case."

On August 30, 1990, in *Holmes v. Robinson,* 84 Md.App. 144, 578 A.2d 294 (1990), the Court of Special Appeals of Maryland affirmed the Circuit Court's decision, holding that neither Maryland statutory law nor the Due Process Clause of the United States Constitution entitled appellants to a hearing regarding the reinstatement of their work release status, and that the Secretary's reviews of appellants' work release statuses were not "contested cases" over which the state court had jurisdiction. In reaching those conclusions, the Court of Special Appeals specifically held that appellants' work release status was not a liberty interest protected by the Due Process Clause of the United States Constitution. The Court of Appeals denied appellants' quest for certiorari review on January 4, 1991. *Holmes v. Robinson,* 321 Md. 501, 583 A.2d 275 (1991).

Focusing upon the pending state administrative agency proceedings, namely Secretary Robinson's review of the reinstatement of the *Alston* plaintiffs, defendants asked this Court on August 29, 1989, to

---

**13.** Md. State Gov't Code Ann. § 10–215(a) states that "[a] party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section." Md. State Gov't Code Ann. § 10–201(c) defines a "contested case" as

    ... a proceeding before an agency to determine:

    (1) a right, duty, statutory entitlement, or privilege of a person that is required by law to be determined only after an opportunity for an agency hearing; ...

**14.** Appellants' Answer and Memorandum in Response to Motion to Dismiss at 4.

**15.** *Id.* at 5.

abstain on *Younger v. Harris*[16] grounds. Plaintiffs opposed such abstention. However, on December 20, 1989, this Court, with the agreement of counsel on both sides, ordered the *Alston* action in this Court *stayed* until final resolution of the claims asserted in *Holmes*.[17] In so doing, this Court indicated that it preferred to permit state law to develop and be finalized within the state executive, administrative and judicial departments because those state law developments (1) might otherwise occur subsequent to a decision of this Court and thereby necessitate a remand to this Court by the United States Court of Appeals for the Fourth Circuit or the Supreme Court of the United States; (2) might obviate the need for one or more federal constitutional issue rulings by this Court; or (3) might narrow any federal constitutional issues remaining for this Court's adjudication.[18] After the Court of Appeals of Maryland denied appellants' petition for a writ of certiorari on January 4, 1991, defendants in *Alston*, asserting the bar of that decision and without waiving their previously stated grounds for summary judgment, moved on March 8, 1991, for summary judgment as to all of the claims of the *Alston* plaintiffs which are based upon a constitutionally protected liberty interest in work release arising from the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## II.   FACTUAL BACKGROUND [19]

Patuxent Institution is a prison located in Jessup, Maryland, and was established by the Maryland General Assembly in 1951 under Article 31B of the Maryland Code to operate separately and independently from the prisons under the jurisdiction of Maryland's Division of Correction. The statutory purpose of Patuxent was "to provide efficient and adequate programs and services for treatment with the goal of rehabilitation of eligible persons." Md.Ann. Code, Art. 31B § 2(b) (1990). An "eligible person" under Article 31B of the Maryland Code is an inmate with at least three years remaining to serve who "has an intellectual deficiency or emotional unbalance," "is likely to respond favorably to the programs and services provided at Patuxent" and "can be better rehabilitated through those programs and services than by other incarceration." *Id.* § 1(f)(1). Under the 1989 amendments, however, an inmate cannot be an "eligible person" if he is serving two or more life sentences, or serving one or more life sentences imposed in a case in which the death penalty was available and aggravating circumstances were found beyond a reasonable doubt, or serving a sentence for conviction of first degree murder, rape or sexual offense not accompanied by a sentencing judge's recommendation for an evaluation at Patuxent. *Id.* § 1(f)(2).

Patuxent Institution is headed by a Director who serves under the authority and jurisdiction of the Secretary of the Maryland Department of Public Safety and Correctional Services. The Secretary is responsible for the orderly and efficient administration of all state correctional facilities. The Director of Patuxent is also a member of Patuxent's Board of Review which is composed of nine members [20] and has the authority to grant parole, work release and leaves of absence of Patuxent inmates.[21] Under Article 31B, § 11(b)(1), the Board of Review may also determine without statutory restriction that an inmate at Patuxent is no longer an "eligible person" and may have him transferred to a prison within the Division of Correction.

---

**16.** 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**17.** This Court did not specifically rule upon defendants' motion for abstention, as such.

**18.** *See* Memorandum of this Court dated July 23, 1991, addressed to counsel in *Alston* and *Bartholomey.*

**19.** The following facts have been stipulated by all of the parties in *Alston* and *Bartholomey.*

**20.** Before the 1989 amendments to Patuxent's enabling statute the Board of Review had only eight members.

**21.** The Governor's approval is also required for a grant of parole to an inmate serving a life sentence. Md.Ann.Code, art. 31B, § 11(b)(3).

Admission to Patuxent as an "eligible person" is determined by the Director and an evaluation team of at least three professional employees of the Institution, including a social worker or behavioral scientist, a psychiatrist and a psychologist. *Id.* § 1(g), 8(c). Patuxent itself is staffed extensively by psychiatrists, psychologists and social workers who employ "traditional psychodynamically oriented group and individual therap[ies]" as well as biofeedback and behavior modification.[22] Treatment at Patuxent revolves around the "graded tier system" in which an inmate progresses through four levels of rehabilitation and increased privileges, and then eventually to leave status, work release status, and parole. Satisfactory behavior on work release is a precondition for receiving parole.

A factor considered by the Board of Review in granting work release status to the *Alston* plaintiffs was whether they posed an unreasonable danger to society. Upon being approved for work release, each *Alston* plaintiff signed a work release agreement containing general rules governing participation in the program and special conditions based upon each plaintiff's particular situation. Those work release agreements were for a period of one year and had to be re-approved by the Board of Review each year. For thirteen years prior to December 1, 1988, the status of an inmate who was already approved for work release was renewed each year thereafter unless he violated the terms or special conditions of his agreement, or any other rules or regulations of Patuxent. Prior to December 1, 1988, whenever an inmate was charged with violating the terms or conditions of his work release agreement, Patuxent would give that inmate notice of the alleged violation, notice of possible action by the Board of Review, and an opportunity to appear before the Board to present any mitigating circumstances. Most work release participants were housed in individual rooms in a minimum security Re–Entry Facility in Baltimore, Maryland, and were permitted to wear clothing of their own choice, to shop in the community, to acquire credit cards and to purchase automobiles. All work release inmates traveled unescorted to and from their jobs. Many such inmates were regularly granted each week one-day leaves to visit family and friends, and some inmates were granted regular weekend and holiday leaves. As of the time of the filing of the *Alston* suit on June 23, 1989, no *Alston* plaintiff had been charged with violating any of the terms or conditions of his work release agreement.

In the wake of negative press scrutiny concerning Patuxent's prison furloughs in late 1988,[23] the Board of Review emergently suspended Patuxent's work release and leave programs on December 1, 1988. The *Alston* plaintiffs who resided at the Re–Entry Facility in Baltimore were shackled and returned to Patuxent at 1:00 a.m. on December 1, 1988. Plaintiffs' suspension from their work release status was not prompted by any contemporaneous act or omission of the individual plaintiffs. On March 20, 1989, the Governor of Maryland signed into law an emergency bill passed by the Maryland General Assembly which amended Patuxent's enabling legislation, Article 31B of the Maryland Code.

On June 12, 1989, ten of the *Alston* plaintiffs were advised by letter that individual hearings concerning their reinstatement into work release status would be held on June 26, 1989. That letter advised

---

**22.** Treatment Manual, Patuxent Institution, at 2 (April, 1988).

**23.** In November, 1988, the media critically reported that Robert Angell, a 31 year old Patuxent inmate had been released eleven times on unsupervised day leave by the Board of Review between March, 1988 and November, 1988. Angell had been sentenced to three consecutive life terms for the 1975 shooting of a 17 year old boy and the 1976 shooting of two state police officers, while being pursued as a bank robbery suspect. In response to this press report, the Patuxent Board of Review suspended Thanksgiving furloughs.

In November, 1988, police also identified Patuxent inmate James Stavarakas as the primary suspect in a rape committed in Prince George's County, when Stavarakas failed to return to Patuxent after leaving his work release job. Stavarkas was eventually convicted of first degree rape. When that rape occurred Stavarakas was serving a twenty-five year sentence at Patuxent for a 1978 rape.

them of the purpose and of the procedure of the hearing, their right to limited representation, and their right to present any information and documentary evidence in favor of their restoration to work release status. The remaining *Alston* plaintiffs were notified by letter dated July 6, 1989 that their reinstatement hearings were scheduled for either July 14, 1989, or July 27, 1989. A board consisting of defendants Johns, Murry, Taylor, and Brown conducted the reinstatement hearings on the above indicated dates and provided to defendant Robinson video tapes and a detailed report of all of the hearings with the board's recommendation concerning each inmate. Pursuant to Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218 [24], Secretary Robinson made the final determination as to each inmate's work release status. The Secretary's counsel advised plaintiffs' counsel by letter dated June 8, 1990, that Secretary Robinson "reserves the discretion conferred by statute [25] to review work release decisions as to *all* future cases, including those relating to plaintiffs."

### III. DUE PROCESS AND COLLATERAL ESTOPPEL

Defendants in *Alston* assert entitlement to summary judgment as to all of plaintiffs' claims based upon a liberty interest in work release allegedly protected by the Due Process Clause of the Fourteenth Amendment on the ground that the decision of the Court of Special Appeals of Maryland, *Holmes v. Robinson*, 84 Md. App. 144, 578 A.2d 294 (1990), *cert. denied*, 321 Md. 501, 583 A.2d 275 (1991), precludes further litigation of that issue in this Court. Plaintiffs in *Alston* respond that *Holmes* does not bar their federal due process claims, at least in part, because (1) *Holmes* involved only twenty-three of the twenty-eight *Alston* plaintiffs, (2) the due process issue decided by the Court of Special Appeals of Maryland is not sufficiently identical to the due process issues raised in *Alston*, and (3) the exception enunciated in *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), applies to save their claims from preclusion.

"It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Observing that "nothing in the language of § 1983 remotely expresses any congressional intent to contravene the common-law rules of preclusion or to repeal the express statutory requirements of the predecessor of 28 U.S.C. § 1738 [Good Faith and Credit Clause]," *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Supreme Court stated

> [t]here is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.

*Id.* at 104, 101 S.Ct. at 420.

Under Maryland law,

> [w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is

---

**24.** This 1989 amended provision states in pertinent part:

[B]efore reinstituting the work release and leave programs at Patuxent Institution, the Secretary of Public Safety and Correctional Services shall promptly review the status of each eligible person who had work release or leave status before the programs were suspended to determine if the eligible person is a threat to public safety.

Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218.

**25.** Defendant Robinson argues that that discretion is conferred by Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218, *see* note 24 *supra*, in conjunction with Article 41, § 4–104(c) which allows the Secretary to

exercise or perform any power, duty, responsibility or function which any of the divisions, boards, commissions, offices or other agencies within the jurisdiction of the Department of Public Safety and Correctional Services are authorized to exercise or perform ...

essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) (quoted with approval in *Cassidy v. Bd. of Educ.*, 316 Md. 50, 62, 557 A.2d 227 (1989)). According to Maryland case law, an issue is precluded only if (1) the issue presented is identical to the issue previously adjudicated, (2) the party to be estopped was a party in the prior action, and (3) there was a prior final judgment on the merits.[26] *O'Reilly v. County Bd. of Appeals*, 900 F.2d 789, 791 (4th Cir.1990); *MPC, Inc. v. Kenny*, 279 Md. 29, 35, 367 A.2d 486 (1977).

▆▆ Plaintiffs are correct that, under Maryland law, the *Holmes* decision may not be used to preclude the claims of those five *Alston* plaintiffs who did not join in the *Holmes* suit. However, the due process claims of those five plaintiffs and their quest for declaratory relief, and for injunctive relief ordering them to be reinstated into the work release program, have become moot because each and all of those plaintiffs, within less than a year after their suspension, were reinstated, released from prison, or voluntarily left the Patuxent program.[27] *See Weinstein v. Bradford*, 423 U.S. 147, 148–49, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir.1987); *Taylor v. Rogers*, 781 F.2d 1047, 1051 (4th Cir.1986); *Ross v. Reed*, 719 F.2d 689, 694 (4th Cir.1983) (quoting *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969)). The conduct of which those *Alston* plaintiffs complain is not "ca-

pable of repetition, [while] evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). In order to fall within that exception to the general mootness doctrine, plaintiffs must demonstrate that a " ' "real and immediate threat" ' " exists that their work release status will again be suspended in the same or similar allegedly unconstitutional manner. *Buie v. Jones*, 717 F.2d 925, 928 (4th Cir.1983) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983)). For the past thirteen years the work release status of a participant at Patuxent has never been revoked unless that inmate violated a condition of that work release. Thus, in *Alston*, there is no "reasonable probability" that the work release of those particular non-*Holmes* plaintiffs will be suspended in the manner of which they complain "within the foreseeable 'immediate' future." *Id.* Significantly, plaintiffs do not challenge the constitutionality of the post-reinstatement hearings to determine the suitability of individual Patuxent inmates for placement into the work release program.[28] The five non-*Holmes* plaintiffs' claims for monetary damages, however, are not moot, and are discussed in Section IV *infra. See Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir.1976); *United States ex rel. Jones v. Rundle*, 453 F.2d 147, 150–151 (3d Cir. 1971).

▆▆ In *Alston*, plaintiffs contend that the due process issue decided in *Holmes* is not sufficiently identical to the due process issue which they raise in this Court because (1) the state court held only that

**26.** While plaintiffs in *Alston* do not dispute that *Holmes* is a final judgment, *see DeMaio v. Lumbermens Mutual Casualty Co.*, 247 Md. 30, 34, 230 A.2d 279 (1967), they do appear to argue that the preclusive effect of dismissals for lack of jurisdiction is more attenuated than in merits adjudications and that the only issue precluded by the *Holmes* decision is whether a state court has jurisdiction to review Secretary Robinson's decision. In *Holmes*, both the issues of jurisdiction and plaintiffs' allegedly constitutionally protected liberty interest in work release were fully litigated and finally adjudicated. *See Annapolis Urban Renewal Auth. v. Interlink, Inc.*, 43 Md.App. 286, 405 A.2d 313 (1979).

**27.** Defendants' counsel informed this Court by letter dated September 17, 1990, that Roger Osborn was mandatorily released on July 21, 1989; Raymond Poellot and Thomas Sikalis were restored to work release status in October, 1989; and Regenault Wright–El and Clifton Rorie voluntarily left Patuxent to return to the Division of Correction system in August and September, 1989, respectively.

**28.** *See* Plaintiffs' Rebuttal Memorandum (filed June 7, 1990) at 18.

"appellants were not entitled under the Due Process Clause to a hearing on whether their work release statuses should have been reinstated by appellee," *Holmes*, 84 Md.App. at 153, 578 A.2d 294; (2) the due process issues in *Alston* are more expansive temporally; (3) the *Alston* plaintiffs have challenged the substantive bases for Secretary Robinson's decisions as well as the procedures which the Secretary employed; and (4) it is impossible to determine whether the *Holmes* court actually considered and rejected the existence of a liberty interest as of the time of suspension on December 1, 1988, that is, a liberty interest created by Patuxent's practice, internal guidelines and written treatment policy prior to December 1, 1988.

Although the Court of Special Appeals was only required in *Holmes* to reach the jurisdictional issue, there is no question that that Court did conclude that plaintiffs were not entitled to any state law created liberty interest protected by the Due Process Clause of the United States Constitution. In fact, that Court cited *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), and *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989), for the proposition that although prison regulations may provide substantial guidelines for prison officials, only mandatory language in those regulations places sufficient limitations on official discretion to create a constitutionally protected liberty interest. *Holmes*, 84 Md.App. at 151–52, 578 A.2d 294. In addition, the Court of Special Appeals then wrote:

> Appellants are unable to identify any specific statutory provision or Patuxent regulation that contains the mandatory language necessary to create a liberty interest. Instead they rely upon the "net effect of Patuxent's regulatory scheme," "Patuxent's past practice" and "Patuxent's underlying philosophy." Appellants have ignored Article 27 § 700A of Md. Code Ann., which ... specifically grants appellee unfettered discretion in revoking an inmate's work release status ... Where state law " 'imposes no conditions on the discretionary power [of the

prison official]', there [is] no basis for invoking the protections of the Due Process Clause."

*Id.* at 153, 578 A.2d 294 (citations omitted). As the above statement by the Court of Special Appeals demonstrates, that Court not only considered whether Patuxent's policies and practices as of December, 1988, created a constitutionally protected liberty interest, but concluded that those policies and practices were insufficient as a matter of law to create a federal due process right. Consequently, plaintiffs are collaterally estopped from litigating the liberty and the due process issues in this case, by the preclusive effect of *Holmes*, unless they can bring themselves within the exception provided by *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). *See also Walpole v. Hill*, 472 U.S. 445, 447, 105 S.Ct. 2768, 2769, 86 L.Ed.2d 356 (1985); *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). The bar of collateral estoppel leaves unscathed, however, plaintiffs' equal protection and *ex post facto* claims.

In *England*, a group of chiropractors challenged in Louisiana federal district court the application to them of a state licensing statute as violative of the Fourteenth Amendment. The federal district court acting *sua sponte*, abstained on the grounds that a question existed as to whether the statute applied to the chiropractors as a matter of state law. The chiropractors thereupon sued in state court, but did not exclude from their briefs or arguments their contention that the state licensing statute, if it applied to them, violated the Fourteenth Amendment. The Supreme Court of Louisiana decided that the statute applied to the chiropractors and, as it so applied, did not violate the Fourteenth Amendment. The chiropractors returned to federal district court only to have that court dismiss their complaint on the ground that Louisiana's Supreme Court had already decided all of the issues before the district court, and that the chiropractors' "remedy," after the adverse state court decision, "was by appeal to the Su-

preme Court of the United States." *England*, 375 U.S. at 414, 84 S.Ct. at 464. On direct appeal, the Supreme Court of the United States held that "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then—whether or not he seeks direct review of the state decision in this Court—he has elected to forgo his right to return to the District Court." *Id.* at 419, 84 S.Ct. at 467. The Supreme Court in *England*, however, reversed the lower court's decision on the ground that the rule announced in *England* would be applied only to future cases.

■ The import of *England* is that in order to preserve the right to return to federal court to litigate specific issues, a party must inform the state court of his or her intention to reserve those issues, and must not press and litigate those issues in the state court proceedings. *See England*, 375 U.S. at 421–22, 84 S.Ct. at 467–68. *See also Lurie v. California.*, 633 F.2d 786, 787–88 (9th Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981). *Cf. Lovely v. Laliberte*, 498 F.2d 1261, 1263–64 (1st Cir.), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). Whether or not this Court's December 20, 1989, stay Order in *Alston* amounted to abstention, plaintiffs' behavior in state court did not bring them under the protective umbrella of the *England* exception. Plaintiffs do not allege and the record does not show that plaintiffs expressed in the *Holmes* proceedings any desire to litigate state-law issues only. To the contrary, the *Alston* plaintiffs unreservedly litigated their federal constitutional claims in both the state trial court and in the Court of Special Appeals. Therefore, the twenty-three *Alston* plaintiffs who were plaintiffs in *Holmes* are precluded from pressing in this Court their claim that they have a constitutionally protected liberty interest in work release arising from the Due Process

Clause of the Fourteenth Amendment. To hold otherwise would create the "friction between the state and federal judiciaries" that the doctrines of claim and issue preclusion are designed to avoid. *See England*, 375 U.S. at 419, 84 S.Ct. at 466.

Accordingly, this Court will grant defendants' motion for summary judgment with regard to the federal due process claims of the *Alston* plaintiffs who were plaintiffs in the *Holmes* suit in a separate Order of even date.

## IV. DUE PROCESS: MONETARY DAMAGES

The claims for monetary damages of the five non-*Holmes Alston* plaintiffs remain. Plaintiffs seek both compensatory and nominal damages and sue certain defendants in their official and individual capacities and other defendants in their individual capacities only.

■ The Eleventh Amendment protects the *Alston* defendants sued in their official capacities from a judgment of monetary damages. "The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances." *Mt Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In order for defendants to enjoy Eleventh Amendment immunity, they must, under state law, be deemed "arm[s] of the State." *Id.* Defendant Robinson, Secretary of the Maryland Department of Public Safety and Correctional Services, and defendant Johns, Acting Director of Patuxent and a member of Patuxent's Board of Review, both acted during the relevant time period as arms of the state of Maryland. *See Carder v. Steiner*, 225 Md. 271, 274–275, 276, 170 A.2d 220 (1961), *Clark v. Ferling*, 220 Md. 109, 113–14, 151 A.2d 137 (1959). Accordingly, plaintiffs' claims against Secretary Robinson and Acting Director Johns in their official capacities are barred by the Eleventh Amendment.[29]

---

**29.** Under Maryland law, "the public officer is immune from liability, at least, in the absence of a showing of malice." *Clark*, 220 Md. at 114, 151 A.2d 137. Plaintiffs allege in their amended

complaint that the decisions of Secretary Robinson and Acting Director Johns to remove them from work release were arbitrary and capricious, an abuse of discretion and in blatant

■ The *Alston* defendants who are sued in their individual capacities for due process violations are immune from civil damages under the doctrine of qualified immunity enunciated in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), in which the Supreme Court held that:

> government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. at 2738. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ..." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (1982)). The particular contours of a constitutional right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

> Public officials must consider the possible relevance of legal principles established in analogous factual contexts. However, in cases where there is a legitimate question whether those principles extend to the particular case before the court or whether the particular case might constitute an exception to those principles, the court should sustain a qualified immunity defense.

*McConnell v. Adams*, 829 F.2d 1319, 1325 (4th Cir.1987). *See also Tarantino v. Baker*, 825 F.2d 772, 775 (4th Cir.1987).

Accordingly, the defendants in *Alston* who are sued in their individual capacities are entitled to qualified immunity under *Harlow* and its progeny if those defendants "could have reasonably believed" that the suspension of the plaintiffs' work release statuses did not violate the plaintiffs' constitutional rights "in light of clearly established law." *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039. "The safeguards of the Due Process Clause are triggered only when a Fourteenth Amendment-protected liberty interest is at stake." *Berrier v. Allen*, 951 F.2d 622, 623–24 (4th Cir.1991) (citing *Meachum v. Fano*, 427 U.S. 215, 223–24, 96 S.Ct. 2532, 2537–38, 49 L.Ed.2d 451 (1976)). The first question to be addressed, therefore, is whether the applicable pre–1989 law clearly indicated that inmates participating in the Patuxent work release program had a liberty interest in their work release status.

Plaintiffs contend that Maryland state statutes and Patuxent's regulations, guidelines, procedures and practices have created a liberty interest in plaintiffs' work release statuses. In terms of statutory language, plaintiffs point to Section 10(b) of Article 31B as that statute existed in 1988 and to the fact that *if* the Board of Review made certain findings, the Board could then grant extended *leave* (although not work release) and could thereafter revoke that *leave* if the Board found that the inmate violated a condition of that *leave*.[30] Plaintiffs also cite to the 1989 amendment which provided that "before reinstituting the work release and leave programs at the Patuxent Institution, the Secretary of Pub-

---

disregard of their fundamental rights. Plaintiffs did not allege, however, that defendants acted maliciously. Even assuming, *arguendo* only, that any defendant in *Alston* who acted maliciously would not be deemed an "arm of the State," this would not be a case, on its facts and on the within record, for the application of that principle.

**30.** Section 10(b) of Md.Ann.Code, art. 31B (1988) states in pertinent part:

   (b) *Extended leave.—* ... the board of review may grant extended leave to an eligible

person for a period not to exceed 1 month if the board of review concludes that the extended leave (1) will not impose an unreasonable risk on society and (2) will assist in the treatment and rehabilitation of the eligible person. The board of review may attach reasonable conditions to the extended leave, at any time make reasonable and appropriate modifications of these conditions, and revoke the leave if it finds that the person has violated a condition of the leave.

lic Safety and Correctional Services shall promptly review the status of each eligible person who had work release or leave status before the programs were suspended to determine if the eligible person is a threat to public safety." Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218.

Plaintiffs argue that Patuxent's regulatory framework in 1988, comprised of Patuxent regulations, practice, policy pronouncements, and work release agreements, in effect provided that unless an inmate violated one of the conditions of his work release agreement, the Board of Review would not and could not revoke his work release status, and thus created a legitimate expectation that that work release status will not be revoked unless the inmate violated the terms of his work release agreement.[31] Plaintiffs further em-

---

31. Plaintiffs refer to the following Patuxent Institution Regulations (PIR):

PIR 155–4:

III. Purpose: To provide guidelines for pre-release procedures.

V.E. A contract agreement will be created specifying the rules, regulations and conditions of the release. The contract, including rules, regulations and conditions, must be understood, agreed to, and signed by both the inmate seeking the conditional release and the Chairperson of the Institutional Board of Review.

PIR 155–11:

III. Purpose: To establish policy and procedure for reviewing the status of inmates who commit a major violation of their conditional release program.

V. Policy and Procedure:

Any inmate who commits a major violation of his conditional release program shall be held-off release status and appear before the Board of Review for a status hearing

A. ... The inmate shall not be returned to release status unless authorized by the Board of Review.

B. Upon receipt of notice that an inmate has been held-off conditional release, the Chairperson of the inmate's Unit Treatment Team shall notify the Executive Secretary of the Board of Review that the inmate is to be scheduled for a status hearing pursuant to PIR 240–11....

PIR 155–12:

III. Purpose: To establish policy and procedure for reviewing the status of inmates who commit a minor violation of their conditional release program.

V. Policy and Procedure:

Any inmate who commits a minor violation of his conditional release program shall be held-off release status until returned to status by virtue of the procedure in this regulation or until returned to status by the Board of Review.

....

B. ... Within 72 hours after receiving notice that an inmate member of the Unit has been held-off conditional release, the Unit Chairman or designee shall interview the inmate and determine whether the inmate should be returned to conditional release.

[Section C provides for review and recommendation of the inmate's status by the Associate Directors, with final review and decision by the Director under Section D. Those sections set forth no criteria to guide either the Associate Directors' recommendation or the Director's decision as to whether the inmate should be held-off release status or returned to the same.]

PIR 240–5

V.B. *Informal Hearings required*—The following actions shall be heard by the Board of Review at Regular session, in an informal hearing, and in the presence of the interested E.P. [eligible person for Patuxent program].

  1. Annual Review
  2. Parole recommendations
  3. Status recommendations
  4. Special Eligibility reviews

....

PIR 240–6

V.A. *Executive Secretary to Notify*—The Executive Secretary shall notify each E.P. scheduled for an Annual Review of the impending hearing at least one week prior to the date of the hearing

....

V.C. *Content of Notice*—The notice sent to each E.P. shall state his name, the date of his hearing before the Board, the reason for the hearing, and whether the E.P. or parolee's presence is required.

V.D. .... If the Board is to consider a recommendation that an E.P. lose his eligibility or status, or have the conditions of his status modified, the Executive Secretary shall notify the E.P. at least one week prior to the hearing. The notice shall contain, in additional to those items specified in section C above, a specific statement of the reason for the recommendation made against him.

PIR 240–11

III. Purpose: To establish procedures for making and determining the disposition of requests for status, revocation of status or alteration of status.

V. Policy and Procedure:

The Board of Review shall review and decide the disposition of each request to have an E.P. granted status, have an E.P.'s status revoked, or have the conditions of an E.P.'s status altered.

....

B. ... Whenever an E.P. commits a major violation of the conditions of the E.P.'s status pursuant to PIR 155–11, or is not returned to status after a minor violation pursuant to PIR 155–12, the Executive Secretary of the Board of

phasize that for the past thirteen years, an inmate's work release status, which the Patuxent Board reviews annually, has not been revoked unless that inmate violated the terms or conditions of his work release agreement.[32] Plaintiffs also maintain that a letter dated January 6, 1989 from the Maryland Attorney General's Office to the Maryland Department of Legislative Reference, advising of possible legal problems with the 1989 amendments to Patuxent's enabling statute, vitiates defendants' assertion of a qualified immunity defense.[33]

■ The Supreme Court "has rejected the claim that a constitutional entitlement to release from a valid prison sentence exists independently of a right explicitly conferred by the State." *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 463–34, 101 S.Ct. 2460, 2463–64, 69 L.Ed.2d 158 (1981) (citing *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979)). A state, however, may create a constitutionally protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." If

---

Review shall be notified and the E.P.'s status shall be reviewed by the Board of Review.

....

E. *Criteria for status*—The Board of Review shall determine that both of the following criteria are met before granting status.
1. The grant of status to an E.P. will not impose an unreasonable risk on society; and
2. The grant of status to an E.P. will assist in the treatment and rehabilitation of the E.P.
If the Board of Review determines that an E.P. on status no longer meets both of these criteria, the E.P.'s status shall be revoked.

F. *Factors in status consideration*—The Board of Review shall review all the following factors about the E.P. in deciding whether to grant status:
1. Crime
2. Length of sentence
3. Therapeutic needs and progress
4. Treatment unit's recommendations
5. Treatment Plan
6. Institutional work habits
7. Institutional behavior adjustment
8. Educational and vocational needs and progress
9. Family and community resources; and
10. Any other factor known to the Board of Review

G. *Board to set conditions*—The Board of Review shall have the authority to attach any reasonable conditions to a grant of status that the Board of Review shall determine to be necessary; and shall maintain the authority to alter those conditions upon written recommendation by the treatment unit.

Additionally, plaintiffs cite to the following standardized language printed on the reverse side of the work release agreement which the inmate and Chairperson sign:
.... Upon violation of any of the rules and regulations governing this Work/School Release Program, the inmate will be returned to the Patuxent Institution, and if this status is revoked, will continue to serve his sentence within the confines of the Institution.
Complaint (filed June 23, 1989) at Appendix 5.

**32.** Stipulation of Facts ¶¶ 15, 16 (filed July 31, 1989).

**33.** *See* plaintiff's Motion for Preliminary Injunction (filed June 23, 1989) at Appendix 1. That letter states in part:
Following the committee hearing at which Secretary Robinson and I testified on December 20, I prepared a brief outline for Secretary Robinson which summarizes the majority of the legal problems associated with changes to the Patuxent statute. I am attaching for your review and use a copy of that document. I think it pretty well takes care of all the possible legal problems that could arise.
Plaintiffs underscore the following language contained in the Summary of Legal Problems Associated with Legislative Changes to Patuxent which is attached to the above-quoted letter.
Inmates who were approved for work release have in large part obtained employment, married, have families, financial obligations, etc. Additionally, they did everything "required" of them under existing laws and regulations to obtain their work release status. This has created for them what is oft times called a "liberty interest" in that status. This means that they have an expectation of being continued in that status which the State has in effect created. That status can therefore not be taken away from them unless (1) they violate the rules; or (2) without due process of law for some reason.
*Id.* That Summary concludes:
There has been much litigation on these points around the country in the context of changing parole criteria, changing good time, changing eligibility for participation in programs, etc.
....
We will simply have to keep these legal issues in mind. Frankly, we can expect to have to litigate these issues in one form or another, no matter what legislative changes are made to the Patuxent statute.
*Id.*

the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," the State has not created a constitutionally protected liberty interest.

*Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (quoting *Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465 (1981) (Brennan, J., concurring) (citations omitted)). In its last opinion before the work release suspension at issue here occurred, *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), the Supreme Court held that a Montana parole statute [34] created a liberty interest in parole release because that statute "uses mandatory language ('shall') to 'creat[e] a presumption that parole release will be granted' when the designated findings are made." 482 U.S. at 377, 107 S.Ct. at 2420 (quoting *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106). Writing for the Court in *Allen,* Justice Brennan

> reject[ed] the argument that a statute that mandates release "unless" certain findings are made is different from a statute that mandates release "if," "when," or "subject to" such findings being made. Any such statute "creates a presumption that parole release will be granted."

482 U.S. at 378, 107 S.Ct. at 2421 (quoting *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106). While making clear that mere semantics do not govern the creation of a liberty interest, Justice Brennan nonetheless did not resolve the question over which the "Circuits have split ... whether the absence of mandatory language creating a presumption of release precludes a finding that a statute or regulation creates

a liberty interest." 482 U.S. at 378 n. 10, 107 S.Ct. at 2421 n. 10. Thus, by December, 1988, the Supreme Court had unequivocally declared that language in a state statute or regulation mandating an inmate's release upon the occurrence of a certain finding or condition was sufficient to create a liberty interest in that release, but had not decided by that date whether a liberty interest in release is created by a "statute [which] provides that an individual shall *not* be released *unless* or shall be released *only when* certain conditions are met," or "when a statute or a regulatory parole-release scheme uses elaborate and explicit guidelines to structure the exercise of discretion". *Id.* (emphasis in original).

Section 10(b) of Article 31B, prior to the 1989 amendments, spoke solely to the issue of extended leave, not work release. That section, moreover, did not contain mandatory language, but rather, stated that the Board of Review "may" grant or revoke extended leave upon certain of its own findings. The 1989 legislation which provides that "before reinstituting the work release and leave programs at the Patuxent Institution, the Secretary of Public Health and Safety and Correctional Services shall promptly review the status of each eligible person who had work release or leave status ... to determine if the eligible person is a threat to public safety," while employing the term "shall," does not, by its own terms, mandate the return, or even any decision as to the return, of any inmate to work release or leave status. That statute does not explicitly require the reinstitution of the Patuxent leave programs on any basis.

The Patuxent regulations (PIRs) which plaintiffs cite, do not contain "mandatory language creating a presumption of re-

---

**34.** The Montana statute at issue in *Allen* stated in pertinent part:

> Prisoners eligible for parole. (1) Subject to the following restrictions, the board *shall* release on parole ... any person confined in the Montana state prison or the women's correction center ... when in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community[.]
> ....

> (2) A parole shall be ordered only for the best interests of society and not as an award of clemency or a reduction of sentence or pardon. A prisoner shall be placed on parole only when the board believes that he is able and willing to fulfill the obligations of a law-abiding citizen.

*Allen,* 482 U.S. at 376–77, 107 S.Ct. at 2419–20 (citing Mont.Code Ann. Sec. 46–23–201 (1985) (emphasis added)).

lease." *Allen,* 482 U.S. at 378 n. 10, 107 S.Ct. at 2421 n. 10. Rather, at the most, those regulations employ language which states that an inmate's status will be revoked or not reinstated unless certain findings are made. *See* PIR 155–11, 240–11, note 31 *supra.* As noted above, Justice Brennan wrote in *Allen* that with regard to the "type of statute [which] provides that an individual shall *not* be released *unless* or shall be released *only when* certain conditions are met," "courts have divided on whether such statutes create a liberty interest.... Most courts have found that such statutes set forth criteria that *must* be met before release, but that they do not *require* release if those findings are made." *Allen,* 482 U.S. at 378 n. 10, 107 S.Ct. at 2421 n. 10 (emphasis in original); *see also Paoli v. Lally,* 636 F.Supp. 1252 (D.Md.1986), *aff'd,* 812 F.2d 1489 (4th Cir.), *cert. denied,* 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 137 (1987). Plaintiffs can arguably find support in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), for their claim that under clearly established law they had a protected liberty interest in 1988 in their work release status. In that case, the Supreme Court determined that a liberty interest in not being transferred to a mental hospital was generated by the combination of administrative prison practice and a state statute which provided that if a designated physician makes certain findings, then a prisoner may be transferred to a mental hospital. *Vitek,* 445 U.S. at 489–90, 100 S.Ct. at 1261–62. Although arguably the same general pattern of prison practice and the same general type of state statute or regulation would appear, by analogy, to be at issue in this case, *Vitek* is distinguishable. *Vitek* concerned, as Justice White wrote, "commitment to a mental hospital [which] produces 'a massive curtailment of liberty,' *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), and in consequence 'requires due process protection.' *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (Burger, C.J., concur-

ring)." *Id.* at 491–92, 100 S.Ct. at 1262–63. The holding of *Allen* as well as the Supreme Court's acknowledgement and non-resolution of the circuit split with regards to the minimum statutory language which could trigger a liberty interest in *Allen* indicates that the law which plaintiffs seek to extract from *Vitek,* decided in 1980, was not clearly established in 1988.

Assuming *arguendo* that the language of the Patuxent regulations did meet the test enunciated by Justice Brennan in *Allen,* defendants can reasonably argue that those regulations, nonetheless fail to confer a liberty interest upon plaintiffs because Maryland statutory law, namely, Article 31B, § 10(a) and Article 27 § 700A(b) of the Maryland Code, allows the Commissioner of Correctional Services and, most likely the Board of Review as well, to revoke an inmate's work release status " 'for any constitutionally permissible reason or for no reason at all.' " *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747 (quoting *Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring)); *see also Holmes v. Robinson,* 84 Md.App. at 153, 578 A.2d 294. Whether administrative practice, standing alone, creates a justifiable exception in parole or work release warranting due process protection remains to this date unclear. The Supreme Court's statement in *Dumschat* with regard to the commutation of sentences, while not dispositive as to the issue of work release and the facts of this case, suggests that practice alone may not create a liberty interest:

> A constitutional entitlement cannot "be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past." [citation]. No matter how frequently a particular form of clemency has been granted, the statistical probabilities standing alone generate no constitutional protections; a contrary conclusion would trivialize the Constitution. The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency.

*Dumschat,* 452 U.S. at 465, 101 S.Ct. at 2464 (quoting *Leis v. Flynt,* 439 U.S. 438, 443–44, 99 S.Ct. 698, 701–01, 58 L.Ed.2d 717 (1979)). The circuits in 1988, moreover, appeared divided over whether only statutory or regulatory mandatory language could create a liberty interest or whether, something less formal, such as administrative policy or practice could suffice to create a liberty interest.[35] *See Anderson v. Winsett,* 449 U.S. 1093, 1095, 101 S.Ct. 891, 892, 66 L.Ed.2d 822 (1981) (White, J., dissenting from the denial of the petition for certiorari); *see also Brandon v. District of Columbia Bd. of Parole,* 734 F.2d 56, 61–2 (D.C.Cir.1984). The Ninth Circuit in *Baumann v. Arizona Dept. of Corrections* concluded that "no protected entitlement to release exists unless a state scheme includes" the " 'shall/unless' formula" of *Greenholtz.* 754 F.2d 841, 844 (9th Cir. 1985). Judge Wisdom[36] in *Whitehorn v. Harrelson,* 758 F.2d 1416 (11th Cir.1985) (citing, *inter alia,* to *Vitek,* 445 U.S. at 489–90, 100 S.Ct. at 1261–62; *Dudley v. Stewart,* 724 F.2d 1493 (11th Cir.1984); and *Parker v. Cook,* 642 F.2d 865 (5th Cir. 1981)), however, wrote that "a state-created liberty interest may originate in a state statute or in regulations or in the practices of state or county officials." *See also Lanier v. Fair,* 876 F.2d 243 (1st Cir.1989); *Brennan v. Cunningham,* 813 F.2d 1 (1st Cir.1987); *Durso v. Rowe,* 579

F.2d 1365 (7th Cir.1978). Another issue which both the Supreme Court and the Fourth Circuit have not yet addressed is whether community release agreements signed by the inmates and prison officials, which state that an infraction of the rules contained within them may or must result in the revocation of work release or leave, create a liberty interest in that work release or leave.[37]

In sum, under the applicable pre–1989 law, plaintiffs did not have a clearly protected liberty interest in their work release statuses. Defendants, therefore, "could have reasonably believed"[38] that the December, 1988 suspension of that work release and the subsequent related hearings did not violate the plaintiffs' constitutional rights "in light of clearly established law." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039. Accordingly, defendants are entitled to immunity from liability as to all of the plaintiffs' due process complaints against them under the principles of *Harlow.*

## V. EQUAL PROTECTION

The *Alston* plaintiffs claim that Secretary Robinson has informed them that he will continue in the future to exercise his discretion ultimately to determine whether they receive work release status and leaves of absence. They interpret that statement

**35.** Two recent Fourth Circuit decisions, *O'Bar v. Pinion,* 953 F.2d 74, 84 (4th Cir.1991) and *Berrier v. Allen,* 951 F.2d 622, 625–26 (4th Cir.1991), although they do not directly address whether administrative practice alone may create a liberty interest, contain language suggesting once again the need for "requisite relevant mandatory language" in a statute or in a regulation, *Thompson,* 490 U.S. at 464, 109 S.Ct. at 1910, in order for a liberty interest to be created.

**36.** Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation on the Eleventh Circuit.

**37.** The First Circuit in *Lanier v. Fair,* 876 F.2d 243, 248 (1st Cir.1989) and *Brennan v. Cunningham,* 813 F.2d 1, 7 (1st Cir.1987), appears to deem such community release agreements sufficiently "particularized standards or criteria guiding the State's decisionmakers," *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747, to create a liberty interest in remaining in a halfway house program, at least in light of existing prison manual

regulations setting forth conditions and rules for continued participation in the halfway house program.

**38.** Given that the " 'objective legal reasonableness' " of the defendants' action is the "touchstone of *Harlow,* " *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038 (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738), and that the defendants' "subjective beliefs [with regard to defendants' actions] ... are irrelevant," *id.* at 641, 107 S.Ct. at 3039, the aforementioned letter dated January 6, 1989 from the Maryland Attorney General's Office to the Maryland Department of Legislative Reference would not itself appear to vitiate defendants' qualified immunity claim. In addition, it should be noted that that letter is dated January 6, 1989 and refers to the author's testimony before the Special Joint Committee on Patuxent Institution on December 20, 1988. Both that letter and that testimony occurred *after* the suspension on December 1, 1988 of Patuxent's work release program.

to mean that they will be singled out in the future for special scrutiny in violation of their equal protection rights. Plaintiffs provide no evidence that since their initial suspension, Secretary Robinson has singled them out for special scrutiny in determining their work release or leave status or intends so to do in the future. Moreover, defendants' counsel specifically has advised plaintiffs' counsel by letter dated June 8, 1990, that "Secretary Robinson does not intend to single out plaintiffs for special scrutiny. Prior communications from counsel have sought merely to advise you that the Secretary is reserving the discretion conferred by statute to review work release decisions as to *all* future cases, including those relating to plaintiffs." (emphasis in original).[39] With regard to their equal protection claim, plaintiffs have simply failed to state necessary allegations or to support such allegations with sufficient evidentiary proffers to survive a motion for summary judgment. Summary judgment is warranted if a party fails to "make a showing sufficient to establish the existence of an element essential to" his case and as to which he bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Accordingly, this Court will grant in a separate Order entered herewith, defendants' motion for summary judgment with regard to plaintiffs' equal protection claims.

## VI. EX POST FACTO

The plaintiffs in *Bartholomey* and *Alston* contend that the application to them of the following Maryland laws and practices of Secretary Robinson violate the *ex post facto* clause of the United States Constitution: (1) the 1989 Maryland statute requiring seven votes of the Board of Review; (2) the 1989 Maryland statutory provisions requiring notice to victims and a reasonable time for those victims to respond before the Board may decide to place an inmate on work release or parole; (3) the 1989 Maryland statute which states that the Board of Review "may," instead of "shall" as provided by the prior statute, grant parole upon its determination that such parole will not pose an unreasonable risk to society and will further the inmate's rehabilitation; (4) Secretary Robinson's decisions to suspend the work release program and not to reinstate certain of plaintiffs to work release status because of allegedly retributive and general deterrence reasons; and (5) the state's policy and practice of conferring upon the Secretary the ultimate authority to decide the work release and leave status of all Patuxent inmates.

Defendants contend that the *ex post facto* clause does not apply to any of the above challenged changes to Patuxent's enabling legislation because all Maryland state prisoners, including all Patuxent inmates incarcerated after 1977, are initially and ultimately sentenced to the jurisdiction of the Maryland Division of Correction (DOC) and no laws or regulations concerning the Maryland DOC were changed during the relevant time period. Defendants argue that because plaintiffs have no right to serve their sentences at Patuxent, their being specifically at Patuxent is neither a condition nor a part of their punishment annexed to their crimes. In the alternative, defendants contend that even if the 1989 amendments implicate the *ex post facto* clause, those statutory changes are nevertheless merely procedural, and are not determinative of any of plaintiffs' sen-

---

**39.** In fact, by a prior letter dated May 1, 1990, defendants' counsel responded to plaintiffs' counsel's demand for clarification with regard to secretarial review in the following terms: Secretary Robinson has authorized me to inform you that he does indeed intend to continue to be the final authority over the status of that group of individuals [inmates suspended from work release in December, 1988] ...
....

The Secretary intends and has so instructed Mr. Henneberry that these individuals *are to be handled as any other Patuxent inmates* with regard to their status, review by the Institutional Board of Review, etc. The Secretary reserves unto himself the final decision after review of any IBR [Institutional Board of Review] recommendation, on their going back on work release and/or leave status. (emphasis added).

tences, do not harshen any of plaintiffs' punishments, and do not significantly impinge upon any of plaintiffs' substantive rights. Defendants assert that the changes in Patuxent's laws and practices have not changed the fact that at the time of committing their offenses, the plaintiffs were on notice as to the possible maximum length of their sentences, the criminality of their offenses and the general contours of their parole statute.

The Supreme Court has recently stressed that the *ex post facto* "prohibition which may not be evaded is the one defined by the *Calder* categories [citations omitted] ... [and] the references in *Duncan* and *Malloy* to 'substantial protections' and 'personal rights' should not be read to adopt without explanation an undefined enlargement of the *Ex Post Facto* Clause." *Collins v. Youngblood*, 497 U.S. 37, —— ——, 110 S.Ct. 2715, 2721–22, 111 L.Ed.2d 30, 41–2 (1990)[40] (overruling *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898) and *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883) to the extent they expand *Calder* categories). Justice Chase in *Calder v. Bull*, 3 Dall 386, 390, 1 L.Ed. 648 (1798) (emphasis in the original), had defined as *ex post facto*

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime*, or makes it greater than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the

commission of the offense, *in order to convict the offender.*

The Supreme Court has also determined that "two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (citing *Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937)) (footnotes omitted). A law, however, need not impair a vested, affirmative or enforceable right in order to be prohibited by the *ex post facto* clause. *Id.* at 29–30, 101 S.Ct. at 964–65.[41] Summarizing the guiding policy behind the *ex post facto* prohibition, Justice Marshall wrote:

> Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and government restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

*Id.* at 30–31, 101 S.Ct. at 965.

Laws affecting parole are within the ambit of the *ex post facto* clause. *See Warden v. Marrero*, 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974). "Indeed, courts have repeatedly held that 'parole eligibility is part of the law annexed to the crime at the time of a person's offense.'" *Fender v. Thompson*, 883 F.2d 303 (4th Cir.1989) (quoting *Schwartz v. Muncy*, 834 F.2d 396, 398, n. 8 (4th Cir. 1987)). "The principle underlying each of

---

**40.** In *Collins*, Chief Justice Rehnquist wrote:
The question presented in this case is whether the application of a Texas statute, which was passed after respondent's crime and which allowed the reformation of an improper jury verdict in respondent's case, violates the Ex Post Facto Clause of Art. I, § 10. We hold that it does not.
497 U.S. at —— —— ——, 110 S.Ct. at 2716–18, 111 L.Ed.2d at 36–37.

In *Collins*, the Supreme Court reversed the Fifth Circuit's judgment below.

**41.** "[A] law need not impair a 'vested right' to violate the ex post facto prohibition. Evaluating whether a right has vested is important for claims under the Contracts or Due Process Clause, which solely protect pre-existing entitlements." *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964 (citations omitted).

these decisions is that the retrospective application of a statute modifying or revoking parole eligibility would, '[f]or prisoners who committed crimes before [the statute's] enactment ..., substantially alter[ ] the consequences attached to a crime already completed, and therefore change[ ] "the quantum of punishment." ' " *Id.* at 306 (quoting *Weaver*, 450 U.S. at 33, 101 S.Ct. at 966 (citing *Dobbert v. Florida*, 432 U.S. 282, 293–94, 97 S.Ct. 2290, 2298–99, 53 L.Ed.2d 344 (1977))). The Supreme Court has "recognized that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed" and can be a determinate of that sentence. *Weaver*, 450 U.S. at 32, 101 S.Ct. at 966.

In the context of amendments to the federal Youth Corrections Act, the Fourth Circuit held the retrospective application of the new parole eligibility criteria embodied in those amendments unconstitutional as violative of *ex post facto* principles. In *Marshall v. Garrison*, 659 F.2d 440, 444 (4th Cir.1981), the Fourth Circuit held that the Parole Commission, when it denied parole to the petitioner, had retrospectively applied, in violation of *ex post facto* prohibition, an amended law to the petitioner which required the Parole Commission to consider retributive factors. Under the facts of *Marshall*, retributive factors were absent from the pre-amendment statutory guidelines which required the Board of Parole to make a study of the offender, " 'including a mental and physical examination, to ascertain his personal traits, his capabilities, pertinent circumstances of his school, family life, any previous delinquency or criminal experience, and any mental or physical defects or other factor contributing to his delinquency.' " *Marshall*, 659 F.2d at 442 (quoting 18 U.S.C. § 5014). In *Marshall*, the Fourth Circuit concluded, from a review of the legislative history of the parole statute and the above-quoted enumeration of factors, that "Congress originally intended that the decision whether to release a youth offender should be based on considerations of rehabilitation rather than on considerations of general deterrence and retribution." *Id.* at 443. With regard to the retrospective application of the new 1976 statute incorporating retributive factors, the Fourth Circuit determined that that statute

'changes the legal consequences of acts completed before its effective date' by prescribing that new criteria be considered in evaluating for parole youth offenders who committed crimes before [that statute] ... That provision would also disadvantage prisoners who committed crimes before its effective date, because it would lengthen the period of time those prisoners must spend in prison by making parole more difficult to obtain.

*Id.* at 445 (quoting *Weaver*, 450 U.S. at 31, 101 S.Ct. at 965). The Second Circuit, finding an *ex post facto* violation on similar facts in *Shepard v. Taylor*, 556 F.2d 648 (2d Cir.1977), wrote:

Since parole eligibility is considered an integral part of any sentence, ... official post-sentence action that delays eligibility for supervised release runs afoul of the ex post facto proscription ... This result follows even if the maximum statutory penalty for the crime remains unchanged.

556 F.2d at 654 (citations omitted). *See also DePeralta v. Garrison*, 575 F.2d 749, 751–52 (9th Cir.1978). Thus, the retroactive application of a law which mandates a change in parole or other release eligibility criteria is *ex post facto*. Conversely, a law enacting a procedural change which does not "substantially alter[ ] the consequences" of a crime so as to impermissibly increase " 'the quantum of punishment' " is not *ex post facto*. *Weaver*, 450 U.S. at 33, 101 S.Ct. at 966 (quoting *Dobbert*, 432 U.S. at 293–94, 97 S.Ct. at 2298–99) [42].

In that context, although the issue is a close one, this Court concludes that the *ex post facto* clause applies to the laws and to

---

42. However, the Supreme Court has cautioned that "by simply labelling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause." *Collins*, 497 U.S. at ——, 110 S.Ct. at 2721, 111 L.Ed. at 41.

the official actions which plaintiffs challenge. Although it may be true that plaintiffs, once sentenced, are both initially and ultimately under the jurisdiction of the Maryland Division of Correction, the fact remains that for thirteen years prior to March 20, 1989, Patuxent Institution and the Division of Correction were operating under and applying different statutes with regard to parole, work release, and leave. Although none of those inmates eligible to participate in the Patuxent program had any vested right to remain at that institution, once there, Patuxent's work release scheme became one of the determinates of those inmates' prison sentences. *See Weaver*, 450 U.S. at 32, 101 S.Ct. at 966. Plaintiffs in both *Alston* and *Bartholomey* were "eligible persons" at Patuxent[43] at the time when some of their work release statuses were revoked and when the statutory amendments came into effect. Moreover, although the 1989 amendments may not have increased plaintiffs' possible maximum punishments and/or their actual sentences, if those amendments nevertheless in fact reduced plaintiffs' opportunity to receive parole or to shorten their sentences and thereby created a more onerous standard of punishment, then those changes fall within the purview of the *ex post facto* clause. *See Lindsey*, 301 U.S. at 401, 57 S.Ct. at 799; *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170, 174–76 (7th Cir.1979). In other words, if plaintiffs are sufficiently "disadvantaged by the reduced opportunity to shorten [their] time in prison simply through good conduct," *Weaver*, 450 U.S. at 33–34, 101 S.Ct. at 967, the application of the *ex post facto* clause is triggered. *See also Watson v. Estelle*, 859 F.2d 105, 109–10 (9th Cir.1988).

Each of the laws and official actions which plaintiffs challenge is being applied retrospectively to plaintiffs, all of whom committed their offenses prior to December 1, 1988. Plaintiffs contend that all such laws and official actions disadvantage plaintiffs to some degree, and that 1989 amendments, when taken individually and as a whole, can only make it more difficult for inmates at Patuxent to obtain work release and parole. Defendants have not identified one change in the law or practice of Patuxent which makes parole easier to obtain and thereby ameliorates the provisions which plaintiffs seek to enjoin. The issue, therefore, is whether, the legislative and administrative changes which plaintiffs challenge, when considered singly or as a whole, substantially alter the criteria for their parole, work release and/or leave eligibility and whether those changes are substantive or procedural.

### A. Voting Requirements

■■■ Plaintiffs contend that the retrospective application of the requirement that seven out of the nine members of the Board of Review approve leave, work release and parole significantly disadvantages them. Prior to 1989, the statute required a simple majority of a quorum which was five members. Plaintiffs argue that the 1989 amendment requires plaintiffs to achieve a 77.7%, 87.5% or 100% approval rating whereas previous law required them to achieve only a 57.2%, 60%, or 62.5% approval rating in order to gain leave, work release or parole.

Although the seven member requirement does appear to make it more difficult for plaintiffs to achieve parole, the change that that requirement encompasses does not alter the criteria which the Board applies to determine eligibility for parole, and is very much procedural in nature. In *United States ex rel Steigler v. Board of Parole*, 501 F.Supp. 1077 (D.Del.1980), the Court held that the retroactive application of a law which changed the number of required Board of Parole member votes from three out of five to four out of five violated the *ex post facto clause. Steigler* is right on point with this case. However, the persuasive value of *Steigler* is greatly undermined because of that decision's reliance upon *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), which the Supreme Court recently overruled in *Col-*

---

**43.** The only exception is plaintiff Wilson who was physically at Patuxent on December 1,

1988, awaiting evaluation and entrance into Patuxent's program.

lins.[44] *See Steigler,* 501 F.Supp. at 1080–81. Although no case directly on point besides *Steigler* has been brought to this Court's attention, a significant number of courts, which have considered the issue of whether a change in the number of jurors sufficiently disadvantages defendants, have indicated that the same does not violate *ex post facto* clause. *See United States v. Stratton,* 779 F.2d 820, 833–34 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *Iseton v. State,* 472 N.E.2d 643, 652–53 (Ind. App.1984); *State v. Maresca,* 173 Conn. 450, 377 A.2d 1330, 1333 (1977); *State v. McIntosh,* 23 Ariz.App. 246, 532 P.2d 188, 190 (1975). *But see McSears v. State,* 247 Ga. 48, 273 S.E.2d 847 (1981) (relying upon *Thompson*). In the wake of *Collins,* this Court concludes that the seven member vote requirement of the 1989 amendments is a procedural change which does not substantially alter plaintiffs' "quantum of punishment" and thus, does not violate the *ex post facto* clause.

### B. Victim Notice and Response Requirements

■ Plaintiffs contend that the 1989 amendment requirement that victims receive notice and have an opportunity to respond before the Board of Review may grant parole, work release or leave to an inmate at Patuxent impermissibly imports considerations of retribution and general deterrence into Patuxent parole, work release and leave determinations. Plaintiffs argue that prior to the 1989 amendments, decisions as to those matters were based exclusively upon factors of rehabilitation and specific deterrence. As the facts of a recent Fourth Circuit case amply demonstrate, victim statements directly serve the purpose of protecting public safety, a purpose which Patuxent officials have always considered important when making release decisions. *See O'Bar v. Pinion,* 953 F.2d 74 (4th Cir.1991). That fact is not outweighed by the fact that victim statements may in part import considerations of retribution into the release determination process and might make it more difficult for plaintiffs to gain release. The Seventh Circuit has concluded in a similar context that "the retroactive application of the victim notification statute ... does not implicate any ex post facto concerns." *Mosley v. Klincar,* 947 F.2d 1338, 1340 (7th Cir. 1991). The reasoning and findings of the Seventh Circuit are applicable to this case as well:

> [T]his statute simply revised existing parole procedures by requiring the Parole Review Board to notify crime victims of a prisoner's scheduled parole hearing; it did not criminalize previously innocent acts, increase the punishment for a prior crime, or alter the degree of proof necessary to establish Mosley's guilt. Moreover, the notice requirement did not affect the criteria the Parole Review Board used in determining whether a prisoner was entitled to parole; indeed, even under the statute in force at the time Mosley committed his offense, victims were not prohibited from offering their statements to the Parole Review Board, should they have chosen to do so.

*Mosley,* 947 F.2d at 1340.

Plaintiffs additionally argue that the delay occasioned by notifying victims and by giving victims a reasonable opportunity to respond unconstitutionally increases plaintiffs' punishment. Plaintiffs conclusively assert, without any specific evidentiary proffer, that a delay of approximately six months might possibly result from victim notification and response. Such possible amount of delay arguably implicates the *ex post facto* clause.[45] *See Watson v. Estelle,* 859 F.2d 105 (9th Cir.1988) (review every three years instead of annually); *Rodri-*

---

**44.** Judge Stapleton, then a district judge, concluded that *Steigler* was "indistinguishable from" *Thompson. Steigler,* 501 F.Supp. at 1080. Moreover, Judge Stapleton quoted language in *Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925) concerning "substantial personal rights," *Steigler,* 501 F.Supp. at 1080, which the Supreme Court specifically disapproved in *Collins* because it "has imported confusion into the interpretation of the Ex Post Facto Clause." 497 U.S. at ———-———, 110 S.Ct. at 2720–21, 111 L.Ed.2d at 40–41.

**45.** *See* note 47 *infra.*

*guez v. United States Parole Comm'n*, 594 F.2d 170 (7th Cir.1979) (review possibly delayed as long as eighteen months). However, the statutory or regulatory changes in *Rodriguez* and *Estelle* were designed to cause less frequent parole hearings. Here the delay is merely a byproduct of a statute aimed at allowing victim responses to play a part in parole determination and involves less delay than in either *Rodriguez* or *Estelle*.

Accordingly, this Court concludes that the 1989 amendments which require victim notification and a reasonable time for victim response do not violate the *ex post facto* clause.

C. "Shall/May"

■■■ Plaintiffs claim that the amendment to Article 31B which states that the Board of Review "may" instead of "shall" grant parole upon its determination that such parole will not pose an unreasonable risk to society and will further the inmate's rehabilitation allows the Board to consider any criteria as opposed to the traditional criteria of rehabilitation and safety previously applied at Patuxent in determining parole release. Plaintiffs argue that the change to "may" will allow the importation of retributive and general deterrence criteria into decisions which previously were not based upon such factors. Plaintiffs would have a strong *ex post facto* argument in the light of *Marshall*, discussed *supra*, if the statutory change from "shall" to "may" made the consideration of retributive factors mandatory; however, it does not. Only laws or regulations having the force of law, not executive or judicial internal policy or guidelines, are subject to the *ex post facto* prohibition. *Francis v. Fox*, 838 F.2d 1147, 1150 (11th Cir.1988); *Prater v. U.S. Parole Comm'n*, 802 F.2d 948, 951–524 (7th Cir.1986) (en banc); *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170, 173–74 (7th Cir.1979). The statutory amendment at issue does not mandate application of different release criteria at Patuxent. In contrast, the statute at issue in *Marshall* explicitly required the consideration of new factors. 659 F.2d at 443. Moreover, although the "shall" mandated

release upon certain, albeit broad, findings of the Board of Review, and thus "g[a]ve fair warning of [its] effect and permit[ted] individuals to rely on [its] meaning until explicitly changed," *Weaver*, 450 U.S. at 28–29, 101 S.Ct. at 963–64, the 1989 amendment to Sec. 11(b)(2) did not prescribe more punishment or provide less opportunity to shorten a criminal sentence, as did the statutory changes in *Weaver*.

D. Suspension and Secretarial Review

■■■ Plaintiffs object on *ex post facto* grounds to (1) the suspension of the work release program in 1988, (2) the 1989 law requiring the Secretary's approval for the reinstatement of suspended work release participants, (3) the Secretary's 1989 decisions not to reinstate certain of plaintiffs, and (4) the State's policy of continuing secretarial review after the 1988 suspension of the work release and leave program. Plaintiffs claim that the requirement of secretarial approval impermissibly disadvantages plaintiffs by adding another level of review, by delaying plaintiffs' work release and leave, and by allowing the determination of an inmate's work release and leave status to be based upon retributive and general deterrence considerations which previously did not inform that decision. Plaintiffs further contend that the Secretary's decisions not to reinstate some of plaintiffs to work release status were based upon those retributive and general deterrence factors. Plaintiffs maintain that secretarial review will make it more difficult for them to achieve leave, work release and parole. Defendants argue that secretarial review is merely a procedural change requiring but one additional vote for the grant of work release and leave and does not alter the criteria of review for work release or leave.

The Secretary claimed his authority to review plaintiffs' work release status in 1988 under Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218, which provides in pertinent part:

before reinstituting the work release and leave programs at Patuxent Institution, the Secretary of Public Safety and Cor-

rectional Services shall promptly review the status of each eligible person who had work release or leave status before the programs were suspended to determine if the eligible person is a threat to public safety.

Act of Mar. 20, 1989, ch. 6, 1989 Md.Laws 1218. Public safety has always been a key consideration at Patuxent with regard to its work release and leave programs. Hence, the addition of secretarial review pursuant to the above-quoted statute does not import any new criteria into the work release or leave review process. Secretary Robinson asserts that he has power pursuant to Article 41, Section 4–104(c) to continue to review the Board of Review's work release and leave determinations. That statute allows the Secretary to

> exercise or perform any power, duty, responsibility or function which any of the divisions, boards, commissions, offices, or other agencies within the jurisdiction of the Department of Public Safety and Correctional Services are authorized to exercise or perform ...

Md.Ann.Code, art. 41, § 4–104(c). That statutory provision, like Section 5 of chapter 6, quoted *supra*, does not authorize the consideration of any new, much less impermissible, criteria in work release and leave decisions.

Plaintiffs contend, however, that the Secretary based his reinstatement decisions concerning them upon retributive and general deterrence criteria and that the 1989 amendments allow secretarial review in the future to be founded upon such criteria. The Secretary's actions and policies are themselves not laws capable of *ex post*

*facto* prohibition. As noted above, only laws or regulations having the force of law, not executive or judicial internal policy or guidelines, are subject to the *ex post facto* prohibition. *Francis*, 838 F.2d at 1150; *Prater*, 802 F.2d at 951–54; *Rodriguez*, 594 F.2d at 173–74. Here, the suspension of the furlough program in 1988 did not involve any change in any criminal law. Accordingly, the suspension of leaves in 1988 and the institution of review by the Secretary in 1989 and thereafter did not and does not violate *ex post facto* principles. Additionally, although Patuxent has traditionally focused upon rehabilitation and public safety, its own regulations have long authorized the Board of Review to consider an inmate's past crime history and sentence length. *See* PIR 240–11, note 32 *supra*.

In and of itself, secretarial review does not entail the application of a new standard of review for work release and leave participation. Under the 1989 amendments, plaintiffs must win at one additional level of review, i.e. the Secretary, and must also obtain one additional vote in order to be placed on work release or leave. Thus, the analysis in Section A *supra* applies and warrants the conclusion that the requirement of secretarial review is a procedural change which does not alter the standards for review, does not increase plaintiffs' "quantum of punishment" and therefore does not violate the *ex post facto* clause. *See also Raimondo v. Belletire*, 789 F.2d 492, 495–96 (7th Cir.1986) ("additional discretionary review is [not] the type of procedural change that is so far-reaching that it amounts to a change in substantive rights").[46]

---

**46.** Plaintiffs correctly cite *Gluckstern v. Sutton*, 319 Md. 634, 645–46, 664–72, 574 A.2d 898 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 369, 112 L.Ed.2d 331 and *State v. Williams*, 397 So.2d 663 (Fla.1981), in support of their contrary position. However, both cases precede *Collins*. Indeed, the Court of Appeals of Maryland decided *Sutton* approximately two weeks before *Collins*. *Sutton* constitutes an expansive reading of the *ex post facto* clause which the Supreme Court would seemingly no longer sanction. The Court of Appeals of Maryland in *Sutton*, for example, founded its *ex post facto* analysis upon the precept iterated in *Kring v. Missouri*, 107 U.S. 221, 235, 2 S.Ct. 443, 445, 27

L.Ed. 506 (1883) (overruled by *Collins*), that the *ex post facto* prohibition extends broadly to

> "any law passed after the commission of an offense which ... 'in relation to that offense, *or its consequences*, alters the situation of a party to his disadvantage.'"

*Sutton*, 319 Md. at 664–65, 574 A.2d 898. In distinguishing the *Sutton* case from *Dobbert*, the Court of Appeals of Maryland also applied the following "substantial rights" language from *Kring* which the Supreme Court apparently disapproved in *Collins*:

> "[A] change in the law which is deemed 'procedural' is not necessarily exempt from the ex

Lastly, plaintiffs argue that the *delay* occasioned by secretarial review unconstitutionally increases plaintiffs' punishment. In that regard, plaintiffs state, again in a conclusory manner, that a delay of approximately six months could result from the additional requirement of secretarial review. Delay of such length has not been deemed to implicate the *ex post facto* clause. *See Watson*, 859 F.2d 105; *Rodriguez*, 594 F.2d 170.[47]

## VII. ARBITRARY AND CAPRICIOUS

Plaintiffs claim that Secretary Robinson's suspension of the furlough programs in 1988 and his determinations with regard to work release reinstatements were arbitrary and capricious and, thus, in violation of the Due Process Clause. In that regard, plaintiffs point to a series of substantive aspects of the review process, including: the Secretary's use of factors traditionally associated with retribution and general deterrence rather than rehabilitation in assessing whether plaintiffs posed a threat to public safety; the existence of prior determinations by Patuxent's staff that plaintiffs posed no such threat and, in the case of one plaintiff, acceptance for parole one month after the revocation of his work release status; the shift in final decision-making responsibility from the expert Board of Review to the Secretary; and the initial use of a form letter to inform plaintiffs of their continued suspensions. Moreover, plaintiffs claim that the evaluation process used by Secretary Robinson was and is a pretext for the "real reason" for the suspensions—public and political pressure.

■ The Due Process Clause carries a minimal evidentiary standard as well as procedural safeguards when a constitutionally protected liberty interest is at stake. *See Walpole v. Hill*, 472 U.S. 445, 453–54, 105 S.Ct. 2768, 2772–73, 86 L.Ed.2d 356 (1985). However, as decided in Section III *supra*, all of plaintiffs except the five plaintiffs who did not participate in the *Holmes* suit are collaterally estopped from claiming a constitutionally protected liberty interest in their previous work release status. Accordingly, those plaintiffs cannot claim any relief under the minimal evidentiary safeguards enunciated in *Walpole*. As to the five non-*Holmes* plaintiffs, their claims are moot for the same reasons that their other due process claims are now moot. Those plaintiffs therefore cannot seek declaratory and/or injunctive for due process reasons. As to any monetary damages which the non-*Holmes* plaintiffs seek, they are barred by the Eleventh Amendment as to any defendant in his or her official capacity and by the doctrine of qualified immunity as to any defendant in his or her individual capacity.

## VIII. CONCLUSION

For the reasons set forth in this opinion, summary judgment will today be entered for defendants with respect to each and all of plaintiffs' claims in this case.

---

post facto prohibition if the change affects substantial rights."
*Sutton*, 319 Md. at 670 n. 24, 574 A.2d 898 (quoting *Anderson v. Dep't of Health & Mental Hyg.*, 310 Md. 217, 225–26, 528 A.2d 904 (1987) (quoting *Kring v. Missouri*, 107 U.S. at 232, 2 S.Ct. at 452), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988)).

**47.** It is to be noted that if plaintiffs' assertions are factually correct, the delay occasioned by the Board of Review obtaining victim impact information *could* be as long as six months and the delay caused by the need for secretarial approval *could* entail an additional six months. Seemingly, however, if the Secretary and the Board of Review act in good faith and do not permit the need for victim impact information *or* secretarial approval to be pretexts for delays and also handle both assignments efficiently, plaintiffs' fears of such long delays will not materialize. Further, if such fears do prove warranted, similarly situated plaintiffs may seek appropriate relief, particularly if such delay is so unreasonable as to constitute a denial of due process.