745 S.E.2d 110

**Thalma BARTON, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF PROBATION PAROLE AND PARDON SERVICES, Respondent.**

**Appellate Case No. 2012–213234.**

**No. 27281.**

Supreme Court of South Carolina.

Heard May 1, 2013.
Decided July 3, 2013.

396

398

———

Travis Dayhuff and Gary Lee Capps, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Appellant.

Matthew C. Buchanan, of Columbia, for Respondent.

Chief Justice TOAL.

Thalma Barton (Appellant) challenges the Administrative Law Court's (ALC) order affirming the South Carolina Department of Probation, Parole, and Pardon Services' (DPPPS) decision denying her parole. We reverse.

## FACTUAL/PROCEDURAL HISTORY

On May 10, 1982, the Abbeville County Grand Jury indicted Appellant for murder.[1] Appellant pled guilty on May 11, 1982.

---

1. The grand jury's indictment alleged that Appellant killed a minor by means of "beating, choking, strangling, and drowning."

The circuit court sentenced Appellant to life imprisonment. At the time of Appellant's conviction, South Carolina law provided that an individual serving a life sentence for murder would become eligible for parole following completion of twenty years of her sentence. Appellant initially appeared before the Board of Probation, Parole, and Pardon Services (the Parole Board) on July 6, 1997, after completing twenty years of her sentence through the award of good time credits. The Parole Board denied Appellant parole following that hearing, and on twelve subsequent occasions. Appellant's most recent appearance, on January 18, 2012, is at issue here.

The Parole Board is comprised of seven members.[2] Six of those seven members participated in Appellant's hearing. Four members voted in favor of granting Appellant parole, while two members voted against granting parole. According to section 24–21–645 of the South Carolina Code, the Parole Board may issue an order authorizing parole signed either by a majority of its members or by all three members meeting as a parole panel; however, at least two-thirds of the members of the Parole Board must authorize and sign orders approving parole for persons convicted of a violent crime as defined in section 16–1–60 of the South Carolina Code. S.C.Code Ann. § 24–21–645(A) (Supp.2012). Prior to 1987, section 24–21–645 provided that the Parole Board may authorize parole when authorized by a *majority* of its members. *See id.* § 24–21–645 (Supp.1984) (emphasis added).

Although two-thirds of the members of the Parole Board participating in Appellant's hearing voted in favor of parole, the Parole Board ultimately denied parole. As explained in detail, *infra,* the Parole Board interprets section 24–21–645 to require an inmate receive a two-thirds majority vote of the Parole Board's seven members, thus meaning Appellant needed five votes, rather than four, to receive parole. In denying Appellant's parole, the Parole Board cited the nature, seriousness, and indication of violence of her offense.

---

**2.** *See* S.C.Code Ann. § 24–21–10 (2007) (explaining that "The [Parole Board] is composed of seven members. The terms of office of the members are for six years. Six of the seven members must be appointed from each of the congressional districts and one member must be appointed at large.").

Appellant filed a notice of appeal with the ALC, claiming that the Parole Board erred by applying the current version of section 24–21–645 instead of the version of that statute in effect at the time Appellant 'committed her crime. Appellant argued that the version of section 24–21–645 in effect at the time of her conviction required only a majority of the Parole Board vote in favor of parole, and that application of the current version of section 24–21–645, and its two-thirds requirement, constituted an *ex post facto* violation. In the alternative, Appellant also asserted that she should receive parole under the current version of section 24–21–645. According to Appellant, the six members of the Parole Board who participated in her hearing represented a quorum, and she received two-thirds of that quorum, satisfying the statutory conditions for parole.

The ALC rejected Appellant's claims, holding that retroactive application of section 24–21–645's two-thirds requirement did not constitute an *ex post facto* violation, and that the General Assembly intended the term "members of the board" to indicate members of the full Parole Board, and not members of the Parole Board attending or voting at a parole hearing. Appellant appealed the ALC's order to the court of appeals, and this Court certified the case for review pursuant to Rule 204(b), SCACR.

## ISSUES

I. Whether the ALC erred in failing to find the Parole Board's retroactive application of section 24–21–645 of the South Carolina Code constituted an *ex post facto* violation.

II. Whether the ALC erred in failing to reject the Parole Board's interpretation of the two-thirds majority requirement of section 24–21–645 of the South Carolina Code.

## STANDARD OF REVIEW

In an appeal from an ALC decision, the Administrative Procedures Act (APA) provides the appropriate standard of review. S.C.Code Ann. § 1–23–610(B) (Supp.2012).

 This Court will only reverse the decision of an ALC if that decision is:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) (a) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* "The [C]ourt may not substitute its judgment for the judgment of the [ALC] as to the weight of the evidence on questions of fact." *Id.* (alterations added). In determining whether the ALC's decision was supported by substantial evidence, this Court need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion that the ALC reached. *Hill v. S.C. Dep't of Health and Envtl. Control,* 389 S.C. 1, 9–10, 698 S.E.2d 612, 617 (2010).

## LAW/ANALYSIS

### 1. Applicable Law

Section 24–21–645 of the South Carolina Code provides in pertinent part:

(A) The board may issue an order authorizing the parole which must be signed either by a majority of its members or by all three members meeting as a parole panel on the case ninety days prior to the effective date of the parole; *however, at least two-thirds of the members of the board must authorize and sign orders authorizing parole for persons convicted of a violent crime as defined in Section 16–1–60.* A provisional parole order shall include the terms and conditions, if any, to be met by the prisoner during the provisional period and terms and conditions, if any, to be met upon parole.

S.C.Code Ann. § 24–21–645 (Supp.2012) (emphasis added).[3] However, prior to section 24–21–645's amendment as part of

---

3. Section 16–1–60 of the South Carolina Code provides that, "for purposes of definition under South Carolina law, a violent crime" includes:

Act No. 462, the Omnibus Criminal Justice Improvement Act of 1986, the statute did not contain the two-thirds provision emphasized above, and provided:

> The Board may issue an order authorizing the parole which shall be signed either by a majority of its members or by all three members meeting as a parole panel on the case, ninety days prior to the effective date of the parole.

*Id.* § 24–21–645 (Supp.1984).

The gravamen of Appellant's complaint is that the pre-amendment version of section 24–21–645 should apply to her case because she committed her crime prior to the amend-

---

murder; attempted murder; assault and battery by mob, first degree, resulting in death; criminal sexual conduct in the first and second degree and; criminal sexual conduct with minors, first, second, and third degree; assault with intent to commit criminal sexual conduct, first and second degree; assault and battery with intent to kill; assault and battery of a high and aggravated nature; kidnapping; trafficking in persons; voluntary manslaughter; armed robbery; attempted armed robbery; carjacking; drug trafficking ... or trafficking cocaine base ... manufacturing or trafficking methamphetamine ... arson in the first degree; arson in the second degree; burglary in the first degree; burglary in the second degree; engaging a child for a sexual performance; homicide by child abuse; aiding and abetting homicide by child abuse; inflicting great bodily injury upon a child; allowing great bodily injury to be inflicted upon a child; criminal domestic violence of a high and aggravated nature; abuse or neglect of a vulnerable adult resulting in death; abuse or neglect of a vulnerable adult resulting in great bodily injury; taking of a hostage by an inmate; detonating a destructive device upon the capitol grounds resulting in death with malice; spousal sexual battery; producing, directing, or promoting sexual performance by a child; sexual exploitation of a minor first degree; sexual exploitation of a minor second degree; promoting prostitution of a minor; participating in prostitution of a minor; aggravated voyeurism; detonating a destructive device resulting in death with malice; detonating a destructive device resulting in death without malice; boating under the influence resulting in death; vessel operator's failure to render assistance resulting in death; damaging an airport facility or removing equipment resulting in death; failure to stop when signaled by a law enforcement vehicle resulting in death; interference with traffic-control devices, railroad signs, or signals resulting in death; hit and run resulting in death; felony driving under the influence or felony driving with an unlawful alcohol concentration resulting in death; putting destructive or injurious materials on a highway resulting in death; obstruction of a railroad resulting in death; accessory before the fact to commit any of the above offenses; and attempt to commit any of the above offenses.

ment. Alternatively, Appellant asserts that she should have been granted parole even under the amended statute, as both the Parole Board and the ALC interpreted that statute erroneously.

## 2. *Ex Post Facto* Violation

Appellant argues that the Parole Board's retroactive application of section 24–21–645 constitutes an *ex post facto* violation, and that the ALC performed a flawed *ex post facto* analysis. We agree.

The United States and South Carolina Constitutions specifically prohibit the passage of *ex post facto* laws. U.S. Const. art. I, §§ 9, 10; S.C. Const. art. 1, § 4. A measure is an *ex post facto* law when it retroactively alters the definition of a crime or increases the punishment for a crime. *Jernigan v. State,* 340 S.C. 256, 261, 531 S.E.2d 507, 509 (2000). The relevant inquiry regarding an increase in punishment is whether a legislative amendment "produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* (quoting *Cal. Dep't of Corr. v. Morales,* 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). If the amendment produces only a "speculative and attenuated possibility" of increasing an inmate's punishment, then there is no *ex post facto* violation. *Id.* Furthermore, a change in law that merely affects a mode of procedure, but does not alter substantial personal rights is not *ex post facto.* *State v. Huiett,* 302 S.C. 169, 172, 394 S.E.2d 486, 487 (1990) (citing *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987)). A court should look to the effect of the statute on the "quantum of punishment" to determine whether an amendment offends the *ex post facto* prohibition. *Id.*

The ALC rejected Appellant's claim as speculative, and characterized the two-thirds rule change as "purely procedural," based primarily on a line of cases previously analyzed, or decided, by this Court: *Morales, supra, Roller v. Gunn,* 107 F.3d 227 (4th Cir.1997), and *Jernigan v. State,* 340 S.C. 256, 531 S.E.2d 507 (2000).

---

S.C.Code Ann. § 16–1–60 (Supp.2012).

In *Morales,* the United States Supreme Court analyzed the California State Legislature's amendment of a parole statute. A jury convicted Morales of first degree murder in 1971. 514 U.S. at 502, 115 S.Ct. 1597. While serving his sentence, Morales met and later married Lois Washabaugh. *Id.* In April 1980, the state released Morales to a Los Angeles halfway house. *Id.* Shortly thereafter, in July 1980, police recovered a human hand on a Los Angeles freeway, and fingerprint identification matched the hand to Washabaugh. *Id.* Police never located Washabaugh's body, but discovered her car, purse, and credit cards in Morales's possession. *Id.* Morales pleaded *nolo contendere* to second degree murder, and received a sentence of fifteen years' imprisonment to life. *Id.* Morales qualified for parole beginning in 1990. *Id.*

The Board of Prison Terms (the Board) held a hearing to determine Morales's suitability for parole. *Id.* at 502–03, 115 S.Ct. 1597. California law required the Board to set a release date for Morales unless it found public safety required a "more lengthy period of incarceration." *Id.* at 503, 115 S.Ct. 1597. The Board found Morales unsuitable for parole based on numerous reasons including his history of violence and heinous nature of his offense. *Id.* The law in place at the time Morales murdered Washabaugh entitled him to subsequent annual suitability hearings. *Id.* However, in 1981, the California legislature authorized the Board to defer subsequent suitability hearings for up to three years if the prisoner's previous convictions included more than one offense which involved the taking of a life and if the Board found it unreasonable to expect that parole would be granted during the following years and stated a basis for that finding. *Id.* In consideration of the reasons that led the Board to find Morales unsuitable for parole, the Board determined it unreasonable to expect Morales would be found suitable for parole in 1990 or 1991, and scheduled Morales's next hearing for 1992. *Id.*

Morales filed a habeas corpus petition asserting that the 1981 amendment, as applied to him, constituted an *ex post facto* law. *Id.* at 504, 115 S.Ct. 1597. The United States Court of Appeals for the Ninth Circuit agreed, holding that because, "a prisoner cannot be paroled without first having a parole hearing ... any retrospective law making parole hearings less accessible would effectively increase the [prisoner's]

sentence and violate the *ex post facto* clause." *Id.* Accordingly, the Ninth Circuit held that the constitution required the Board to provide Morales with annual parole suitability hearings, as required by the law in effect at the time he committed his crime. *Id.*

The Supreme Court reversed, rejecting Morales's view that the *ex post facto* clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment. *Id.* at 508–09, 115 S.Ct. 1597 (holding that some "speculative, attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release, but that fact alone cannot end the matter for *ex post facto* purposes"). According to the Supreme Court, the proper evaluation of the 1981 amendment centered on whether the amendment produced a sufficient risk of increasing the measure of punishment attached to the covered crime. *Id.* at 509, 115 S.Ct. 1597. The Supreme Court noted that the 1981 amendment applied only to offenders for whom the likelihood of release on parole was quite remote, and that the legislature intended the amendment to relieve the Board from the costly responsibility of scheduling parole hearings for prisoners with little to no chance of being released. *Id.* at 510–11, 115 S.Ct. 1597 (citing *In re Jackson,* 39 Cal.3d 464, 216 Cal.Rptr. 760, 703 P.2d 100, 105 (1985), relying on California legislative history). Additionally, the amendment did not address initial hearings, only subsequent hearings. *Id.* at 511, 115 S.Ct. 1597. Therefore, the amendment had no effect on any prisoner unless the Board found the prisoner unsuitable for parole, and that it was unreasonable to expect that parole would be granted at a hearing in the following years. *Id.* Finally, the Supreme Court noted that the Board retained the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner, and therefore, "the narrow class of prisoners covered by the amendment cannot reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings." *Id.* at 511–12, 115 S.Ct. 1597. In sum, the Supreme Court held the 1981 amendment created only the "most speculative and attenuated risk of increasing the measure of punishment attached to the

covered crime," and thus, did not constitute an *ex post facto* law. *Id.* at 514, 115 S.Ct. 1597.

The *Morales* decision played a critical role in the United States Court of Appeals for the Fourth Circuit's disposition of the defendant's arguments in *Roller v. Cavanaugh,* 984 F.2d 120 (4th Cir.1993) *(Roller I),* and *Roller v. Gunn,* 107 F.3d 227 (4th Cir.1997) *(Roller II* ).

In 1983, Gary Lee Roller was convicted of voluntary man-slaughter and grand larceny and sentenced to consecutive terms of thirty years' imprisonment and five years' imprison-ment. *Roller I,* 984 F.2d at 121. In December 1990, Roller filed a complaint under 42 U.S.C. § 1983 challenging applica-tion of the South Carolina General Assembly's amendments to section 24–21–645 on *ex post facto* grounds. *Id.* The amend-ments mandate that a prisoner convicted of committing a violent crime may only have her case reviewed biannually after an initial denial, rather than annually. *Id.* Additionally, as discussed *supra,* the amendments require a two-thirds majority of the parole board to authorize parole for violent offenders rather than a simple majority. *Id.* The district court found for DPPPS, but the Fourth Circuit reversed. *See Roller I,* 984 F.2d at 124 ("South Carolina has undoubtedly applied its new statute to 'alter the conditions of ... [Roller's] preexisting parole eligibility.' Indeed, it has effectively 're-voked' eligibility for an extra year following a denial." (altera-tion in original) (remanding with instructions to grant declara-tory relief in Roller's favor)).

However, in April 1995, in light of the Supreme Court's *Morales* decision, DPPPS moved for modification of the court order declaring the retrospective application of the section 24–21–645 amendments unconstitutional. *Roller II,* 107 F.3d at 230. In June 1996, based on *Morales,* the district court concluded that application of section 24–21–645 of the South Carolina Code to Roller did not violate the *Ex Post Facto* Clause. *Id.* (citing *Roller v. Gunn,* 932 F.Supp. 729, 730 (D.S.C.1996)). The Fourth Circuit affirmed, holding that South Carolina's amendments bore a "strong resemblance" to the California statute sustained in *Morales.* *Id.* at 235. The court noted the similarities between the South Carolina and California laws, including that neither law increased the actual

sentence of imprisonment and that both laws applied only to prisoners convicted of violent crimes, "prisoners which the South Carolina legislature determined were unlikely to receive release on parole." *Id.* Additionally, neither law affected the date of any prisoner's initial parole suitability hearing, only the timing of subsequent hearings, and did not alter the substantive parole qualification standards. *Id.* at 235–36. Therefore, the Fourth Circuit concluded:

> Roller's claim, however, boils down to mere speculation about his release. Such conjecture is insufficient under *Morales* to establish a violation of the *Ex Post Facto* Clause. In South Carolina, the determination of parole is subject to the broad discretion of the [Parole Board]. Forecasts on how the board might decide to exercise its discretion in any given case are merely in the nature of conjecture. Roller simply fails "to provide support for his speculation that ... prisoners subject to [24–21–645] might experience an unanticipated change that is sufficiently monumental to alter their suitability for release on parole." Furthermore, as the district court noted, there is nothing on the face of section 24–21–645 that limits the [Parole Board's] authority to schedule expedited hearings if presented with suitable circumstances. In *Morales,* this same consideration led the Supreme Court to conclude that even if a prisoner's circumstances drastically changed during the period that his parole hearing had been delayed, "there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement."

*Id.* at 236 (alterations in original).

The Fourth Circuit also addressed the pertinent issue in the instant case, the two-thirds requirement. *Id.* The Fourth Circuit analogized that provision to the statute examined by the Supreme Court in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In *Dobbert,* the trial judge overruled the jury's recommendation of life imprisonment and imposed a death sentence. *Id.* at 286–87, 97 S.Ct. 2290. The defendant claimed that the statute which permitted this decision violated the *Ex Post Facto* Clause because under the pre-amendment statute the jury made the final death penalty determination. *Id.* at 287–88, 292, 97 S.Ct. 2290. The Supreme Court rejected his claim as speculative, holding "it

certainly cannot be said with assurance that, had his trial been conducted under the old statute, the jury would have returned a verdict of life." *Id.* at 294, 97 S.Ct. 2290. In *Roller II,* the Fourth Circuit viewed the defendant's challenge of the two-thirds requirement speculative as well, holding:

> Like the claim of the petitioner in *Dobbert,* Roller's claim is speculative. There is no way of knowing whether a particular board member's vote would be the same under the new two-thirds majority rule as it would have been under the old rule. As the Supreme Court noted in *Dobbert,* "[The jurors] may have chosen leniency when they knew that that decision rested ultimately on the shoulders of the trial judge, but might not have followed the same course if their vote were final." Similarly, parole board members might be more likely to vote for granting parole under the two-thirds rule, knowing that any favorable decision must be concurred in by a greater number of their colleagues.

*Roller II,* 107 F.3d at 236–37 (alteration in original).

The dissent in *Roller* concluded that South Carolina's amendments differed significantly from the California statute analyzed in *Morales.* *Id.* at 238–39 (Hall, J., dissenting). For one, the California statute applied only to prisoners "convicted of more than one offense involving the taking of a life." *Id.* at 238. However, the South Carolina statute applied to all inmates convicted of a violent crime, including crimes for which only one to ten years' imprisonment is prescribed. *Id.* Furthermore, the default requirement under the California statute is annual review, but under the South Carolina statute the default requirement is two years, with no provision requiring the Parole Board to find that deferral is warranted. *Id.* at 239.

The dissent assessed the two-thirds requirement in conjunction with the other changes to South Carolina's parole statute. *Id.* at 239–40 ("The majority considers this change apart from the other retrospective changes in the statute and declares that any *ex post facto* challenge is foreclosed ... As a preliminary matter, I believe the two-thirds requirement must be considered together with other changes to the parole statute."). According to the dissent, if the two-thirds requirement made parole tougher to attain, the factor must be examined in

conjunction with the amendment's decrease in the frequency of hearings to determine whether the overall changes to the statute violated the *Ex Post Facto* Clause. *Id.* at 240. The dissent's ultimate conclusion regarding South Carolina's amended parole statute bears repeating:

> The majority also notes that *Morales* compels upholding the two-thirds requirement because to do otherwise would amount to the judicial "micromanagement" that the Court cautioned against. *Morales* does no such thing. The California statute involved an exceedingly speculative possibility that the punishment of the affected inmates would be increased: The statute applies only to multiple murderers, presumably a small fraction of the inmate population; the Board has to affirmatively decide that a hearing should be deferred and to explain why; the inmate might be able to appeal the deferral decision, and the Board could, of its own volition, advance a hearing date where a change in circumstances warranted; and, significantly, under California's system, the determination of parole suitability often precedes the actual release date by several years. South Carolina's amendments, on the other hand, affect persons convicted of relatively minor crimes; mandate automatic deferrals, with no provision for an administrative appeal; increase the percentage of the Board that must vote to grant parole. In addition, there is no indication that a grant of parole is not ordinarily followed promptly by actual release. If *Morales* is our guide, the South Carolina statute increases the punishment by decreasing the likelihood of release on parole to a degree that offends the *Ex Post Facto* Clause.

*Id.*

This Court found the dissent's reasoning persuasive in its analysis of the petitioner's claim in *Jernigan v. State,* 340 S.C. 256, 531 S.E.2d 507 (2000). In that case, the petitioner filed a post-conviction relief (PCR) action challenging the change in his parole review from annually to biannually. *Id.* at 260, 531 S.E.2d at 509. The Court previously analyzed this parole review change in *Gunter v. State,* 298 S.C. 113, 378 S.E.2d 443 (1989). In that case, the Court held that "the standards governing petitioner's parole eligibility have not been changed," but instead, "only the frequency with which peti-

tioner can be reconsidered for parole has been altered." *Id.* at 115–16, 378 S.E.2d at 444.

However, the Court overruled *Gunter* in *Griffin v. State*, 315 S.C. 285, 433 S.E.2d 862 (1993), *cert. denied*, 510 U.S. 1093, 114 S.Ct. 924, 127 L.Ed.2d 217 (1994). The *Griffin* court adopted the Fourth Circuit's decision in *Roller I*, finding that the change in biannual review was not merely procedural. *Griffin*, 315 S.C. at 288, 433 S.E.2d at 864 ("The Fourth Circuit's analysis is compelling. It is difficult to determine where the difference lies between a review once every two years and once every eight years. This gray area tortures the *ex post facto* analysis between a change in the standards for review and a procedural change in timing.").

In *Jernigan*, this Court found the *Roller II* dissent's analysis more persuasive than that of the *Roller II* majority, stating:

> The South Carolina statute which calls for biannual parole review hearings for all violent offenders is clearly distinguishable from the very specific statute at issue in *Morales*. Under South Carolina law, there is [sic] a variety of crimes defined as violent, and the possible sentences for these crimes'range from one year to life imprisonment. In *Morales*, the statute applied to a very well-defined set of inmates—multiple killers—while the South Carolina statute applies equally to a variety of inmates—from murderers to marijuana traffickers—and many of these inmates will likely be paroled at some point. Moreover, the South Carolina statute does not require any specific findings in order to defer parole review for two years; instead, the two-year interval is automatic after an initial denial of parole.

*Jernigan*, 340 S.C. at 263–64, 531 S.E.2d at 511. Thus, the Court determined that the change from annual parole eligibility review to biannual review produced a sufficient risk of increasing the measure of punishment attached to covered crimes, and any retroactive application of section 24–21–645 constituted an *ex post facto* violation. *Id.* at 264–65, 531 S.E.2d at 512 ("Accordingly this Court's holding in *Griffin v. State, supra*, that retroactive application of the statute increasing parole review to every two years constitutes an ex post facto violation, remains the law in South Carolina.").

The *Jernigan* Court did not address section 24–21–645's two-thirds requirement. In the instant case, the ALC acknowledged that the *Jernigan* Court agreed with the dissent in *Roller II* regarding biannual review, but held this fact is not dispositive of whether the retroactive application of the two-thirds requirement is also a violation of the *Ex Post Facto* Clause. According to the ALC, this Court's *Jernigan* decision concerned the Parole Board's lack of discretion in reviewing parole for inmates convicted of violent crimes and to whom the Parole Board previously denied parole, noting "[t]here was an automatic increase in review from one year to two, regardless of the nature of the crime for which the inmate was convicted, and regardless of the sentence the inmate was serving." The ALC found that in the instant case, the statutory change in the number of votes to approve parole has no bearing on how often the Parole Board members voted, and has no impact on the discretion of the Parole Board or its decision-making process.[4]

---

4. The ALC also concluded that Appellant's argument required the court to speculate how the Parole Board might have voted had section 24–21–645's previous majority requirement applied. The apparent root of the ALC's reasoning on this point is that there is no way to determine whether Appellant would have received four votes from the Parole Board under the prior version of section 24–21–645. Therefore, Appellant cannot demonstrate that the Parole Board members would have voted the same way had they applied the prior version of section 24–21–645 to Appellant's case. However, the ALC engaged in an expansive speculation adventure antithetic to the speculation reasoning the United States Supreme Court expressed in the *Morales* and *Dobbert* decisions. For example, the ALC concluded, the Parole Board members may have *sensed* that the less than two-thirds of the Parole Board was going to vote for parole, and voted for Appellant to encourage her to continue her efforts to rehabilitate. However, in *Dobbert,* the Supreme Court merely reasoned that the defendant could not show that his punishment would have been different under a previous version of the statute. *Dobbert,* 432 U.S. at 294 n. 7, 97 S.Ct. 2290. In *Morales,* the Supreme Court discussed simply that it was speculative to reason that annual parole hearings would enhance the possibility of parole by the narrow class of prisoners covered by the statute analyzed in that case. *Morales,* 514 U.S. at 511–12, 115 S.Ct. 1597. The ALC's argument does not resemble the speculation reasoning of *Dobbert* or *Morales.*

But, perhaps most troubling about the ALC's speculation is its lack of support in the Record. The rejection letter the Parole Board issued Appellant makes no mention of the number of votes she received at her hearing. Moreover, Appellant's counsel noted at oral argument that inmates are not informed of the vote outcome from their hearings

■ We disagree with the ALC's conclusions and hold that this Court's decision in *Jernigan* is controlling. The *Jernigan* Court's rejection of the "speculation" argument regarding biannual review applies with equal force to the two-thirds requirement.[5] The distinctions between the California statute analyzed in *Morales* and the biannual review amendment of section 24-21-645 are evident in the two-thirds requirement, as well. The two-thirds requirement applies to a wide-variety of crimes, rather than a well-defined set of inmates, the two-thirds requirement is the default provision for all violent crimes regardless of the crime's nature, and the requirement compels an offender to convince an additional member of the Parole Board. This certainly "produces a sufficient risk of increasing the measure of punishment," attached to a violent crime. *See Jernigan*, 340 S.C. at 264–65, 531 S.E.2d at 511–12 (relying on *Lynce v. Mathis*, 519 U.S. 433, 444–45, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), for the proposition that if a statute effectively increases the "quantum of punishment," then retroactive application is unconstitutional).

Moreover, section 24-21-645 contains none of the restraints and safeguards critical to the analysis by the majority in *Morales*, or the dissent in *Roller II*.[6]

---

unless they request a recording of their hearing. DPPPS did not contradict this assertion.

**5.** *Jernigan*, 340 S.C. at 264 n. 5, 531 S.E.2d at 511 n. 5 ("In any event, more expansive rights may be afforded under state constitutional provisions than those conferred by the federal constitution. Accordingly we find the change in parole consideration under § 24-21-645 offends S.C. Const. art. I, § 4, even if the federal constitution is not offended." (citing *State v. Easler*, 327 S.C. 121, 489 S.E.2d 617 (1997))).

**6.** The ALC found the United States District Court for the District of Maryland's decision in *Alston v. Robinson*, 791 F.Supp. 569 (D.Md. 1992), persuasive. In that case, the plaintiffs contended that retrospective application of the requirement that seven out of nine members of a parole review board approve leave, work release, and parole, constituted an *ex post facto* violation where previously the statute only required a simple majority of a five-member quorum. *Id.* at 590. The court held that although the seven member requirement did appear to make it "more difficult" for the plaintiffs to achieve parole, the change did not alter the criteria which the parole review board applied to determine parole eligibility, and this fact rendered the change "very much" procedural in nature. *Id.*

The ALC's reliance on *Alston* is misplaced due to that case's primary dependence on authority evaluating whether a change in the number of

Simply put, prior to the amendment, Appellant merely needed to obtain favorable votes from a majority of the Parole Board. Following the amendment, Appellant must obtain favorable votes from two-thirds of the Parole Board. This amendment is not procedural, but poses a sufficient risk of increasing the measure of punishment attached to Appellant's crime and other similarly situated individuals. Additionally, this risk is compounded by the Parole Board's position that Appellant must convince two-thirds of the entire Parole Board, and not merely those members who participate in her hearing.[7] Moreover, this change affects an inmate's substantial personal right to statutorily correct parole review. *See Cooper v. S.C. Dep't of Prob., Parole, and Pardon Servs.*, 377 S.C.

---

jurors required for conviction constitutes an *ex post facto* violation. The analysis of the two-thirds requirement and a reduction in jury size are not sufficiently similar. As the Supreme Court expressed in *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the primary concern in evaluating a jury's appropriate composition is to preserve a size large enough to promote group deliberation free from outside intimidation, and provide a fair possibility for obtaining a cross-section of the community. These are clearly not the principal concerns regarding retroactive application of the amendment to section 24–21–645. Instead, as the Court observed in *Jernigan*, the critical question is whether the change creates a reliable risk of increasing the punishment attached to the inmate's crime. *See Jernigan*, 340 S.C. at 264–65, 531 S.E.2d at 512 (preventing retroactive application of the change from annual parole eligibility review to biannual review). The *Williams* Court held that "neither currently available evidence nor theory suggests that the 12–man jury is necessarily more advantageous to the defendant than a jury composed of fewer members." *See Williams*, 399 U.S. at 100, 90 S.Ct. 1893. It is error to conflate this jury-specific reasoning with an analysis of section 24–21–645 and its two-thirds requirement.

7. *Cf. Garner v. Jones*, 529 U.S. 244, 255, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000) ("When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule. The litigation in *Morales* concerned a statute covering inmates convicted of more than one homicide and proceeded on the assumption that there were no relevant differences between inmates for purposes of discerning whether retroactive application of the amended California law violated the *Ex Post Facto* Clause. In the case before us, respondent must show that *as applied to his own sentence* the law created a significant risk of increasing his punishment." (emphasis added)).

489, 499, 661 S.E.2d 106, 111–12 (2008) ("Parole is a privilege and Cooper has no right to be paroled; however, Cooper does have a right to require the [Parole Board] to adhere to statutory requirements in rendering a decision." (alteration added)).

It is clearly more difficult to convince a two-thirds majority of the Parole Board to grant parole, than a simple majority, and the identical issues posed by retroactive application of the biannual review procedure apply similarly to the two-thirds requirement.[8]

### 3. The Meaning of "Two–Thirds"

Appellant argues that the ALC's construction of section 24–21–645 is erroneous and should be rejected. We agree.

 Statutory interpretation is a question of law subject to de novo review. *Town of Summerville v. City of N. Charleston,* 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008) (citation omitted). "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Media Gen. Commc'ns, Inc. v. S.C. Dep't of Revenue,* 388 S.C. 138, 147–48, 694 S.E.2d 525, 529 (2010) (quoting *Charleston Cnty. Sch. Dist. v. State Budget & Control Bd.,* 313 S.C. 1, 5, 437 S.E.2d 6, 8 (1993)). Where the statute's language is plain, unambiguous, and conveys a clear, definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning. *Gay v. Ariail,* 381 S.C. 341, 345, 673 S.E.2d 418, 420 (2009). "If the statute is ambiguous . . . courts must construe the terms of the statute." *Town of Mt. Pleasant v. Roberts,* 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011) (citation omitted). The statutory language

---

8. DPPPS also argues that because Appellant pled guilty and received a sentence of life imprisonment, retroactive application of section 24–21–645 could not increase her punishment because, "the extent of her punishment is that she would spend the rest of her life in prison." This argument is without merit. At the time of Appellant's sentencing a person imprisoned for life would become eligible for parole after serving twenty years of her sentence. Moreover, the nature of parole is early release from imprisonment. The rationale asserted by DPPPS would foreclose all *ex post facto* claims by potential parolees given that the true extent of their "punishment," or imprisonment, has not yet been completed. This view of parole and *ex post facto* law is untenable and more importantly, legally insufficient.

must be construed in light of the intended purpose of the statute. *Id.* This Court will not construe a statute in a way which leads to an absurd result or renders it meaningless. *See Lancaster Cnty. Bar Ass'n v. S.C. Comm'n on Indigent Defense,* 380 S.C. 219, 222, 670 S.E.2d 371, 373 (2008) ("In construing a statute, this Court will reject an interpretation which leads to an absurd result that could not have been intended by the legislature."). "The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons." *Dunton v. S.C. Bd. of Exam'rs In Optometry,* 291 S.C. 221, 223, 353 S.E.2d 132, 133 (1987) (citations omitted).

 The Parole Board is comprised of seven members. S.C.Code Ann. § 24–21–10(B) (Supp.2012). Section 24–21–645 of the South Carolina Code provides that the Parole Board may issue an order authorizing parole signed by either a majority of its members or by all three members meeting as a panel. *Id.* § 24–21–645 (Supp.2012). However, "at least two-thirds of the members of the [Parole Board] must authorize and sign orders authorizing parole for persons convicted of a violent crime as defined in section 16–1–60 of the South Carolina Code." *Id.* Section 24–21–645 does not specify a quorum for Parole Board meetings but "in the absence of any statutory or other controlling provision, the common-law rule that a *majority* of the whole board is necessary to constitute a quorum applies, and the board may do no valid act in the absence of a quorum." *Garris v. Governing Bd. of S.C. Reins. Facility,* 333 S.C. 432, 453, 511 S.E.2d 48, 59 (1998) (emphasis added); *see also James v. S.C. Dep't of Prob., Parole, and Pardon Servs.,* 377 S.C. 564, 569, 660 S.E.2d 288, 291 (Ct.App. 2008) ("Here, five members of the [Parole Board] were present, and each voted to deny ... parole. A unanimous and majority decision was reached by a quorum in this hearing." (alterations added)).

Appellant interprets "members of the board" in section 24–21–645 to mean those members of the Parole Board present and voting at a parole hearing. Appellant argues that conversely, her interpretation does not include members who did not attend the hearing. DPPPS counters that, even though a quorum of the Parole Board is all that is required to conduct

business, the statute's "members of the board" language means that an inmate convicted of a crime must get at least two-thirds of the seven members of the Parole Board.

 The ALC agreed with DPPPS, and held that "members of the board" connotes the entire seven members of the Parole Board. According to the ALC, because section 24–21–10(B) of the South Carolina code defines the Parole Board as composed of seven members, section 24–21–645(A)'s two-thirds requirement pertaining to "members of the board," means that an inmate convicted of a violent crime must obtain favorable votes from at least two-thirds of the seven Parole Board members. The ALC reasoned that the portion of section 24–21–645(A) permitting the Parole Board to authorize parole for non-violent offenses by simple majority when read in conjunction with the two-thirds requirement demonstrates that the General Assembly "meant for the term 'members of the board' to mean members of the full Parole Board, and not members of the [Parole Board] attending or voting at a parole hearing." The ALC's interpretation is wrong.

Section 24–21–645 is ambiguous, and thus susceptible to more than one interpretation. Obviously, the statute can be read to mean that an offender must receive votes from two-thirds of the members of the entire Parole Board, regardless of how many members actually attend a hearing. However, as Appellant notes, the terms "majority" and "two-thirds" as utilized by section 24–21–645 are not static terms, and their meaning changes depending on their application. Thus, the fact that the General Assembly used such terms does not evince intent to require inmates convicted of violent offense to obtain favorable votes from five members of the Parole Board regardless of the actual composition of the Parole Board at the inmates hearing.[9]

---

9. Comparison with section 24–21–30 of the South Carolina Code is instructive. Section 24–21–30 provides in pertinent part:

(B) The board may grant parole to an offender who commits a violent crime as defined in Section 16–1–60 which is not included as a "no parole offense" as defined in Section 24–13–100 on or after the effective date of this section by a two-thirds majority vote of the *full* board. The board may grant parole to an offender convicted of an offense which is not a violent crime as defined in Section 16–1–60 or a "no parole offense" as defined in Section 24–13–100 by a unani-

Requiring Appellant to only obtain votes from Parole Board members actually present at her hearing comports with the common meaning and understanding of the term "quorum." In the absence of a controlling provision, the common-law rule that a majority of the whole board is necessary to constitute a quorum applies. *Garris,* 333 S.C. at 453, 511 S.E.2d at 59. Section 24–21–645 does not specify the number of Parole Board members that must review the parole suitability of an inmate convicted of a violent crime, but also does not expressly exclude the common-law quorum principle. *See, e.g., Doe v. Marion,* 361 S.C. 463, 473, 605 S.E.2d 556, 561 (Ct.App.2004), *aff'd,* 373 S.C. 390, 645 S.E.2d 245 (2007) ("[A] statute is not to be construed in derogation of common law rights if another interpretation is reasonable." (alteration added)). Thus, the

mous vote of a three-member panel or by a majority vote of the *full* board.

S.C.Code Ann. § 24–21–30 (2007) (emphasis added).

The parties agree that although section 24–21–30 and section 24–21–645 are similar, the latter statute controls the instant case. Section 24–21–645 speaks directly to "Parole and provisional orders," within the context of a review schedule following "parole denial of prisoners confined for violent crimes." S.C.Code Ann. § 24–21–645 (Supp.2012). Section 24–21–30 does not contain this language, and is entitled "Meetings; parole and pardon panels." S.C.Code Ann. § 24–21–30 (Supp. 2012). It is conceivable that the General Assembly included the "full board" language to address parole orders under section 24–21–30, but expressly did not include this language in section 24–21–645 in providing direction to the Parole Board in addressing those inmates convicted of a violent crime that had previously been denied parole by the "full board." Regardless, it is clear that the General Assembly did not include the term "full board" in section 24–21–645 or 24–21–650, but included the term in section 24–21–30. *See id.* § 24–21–650 (explaining the issuance of an order of parole). Furthermore, the General Assembly amended section 24–21–30 in 1995, ten years following section 24–21–645's amendment. *See id.* § 24–21–30 (Supp.1995) ("From and after January 1, 1996, this section reads as follows."). These facts weigh in favor of construing section 24–21–645 as not requiring an inmate convicted of a violent crime to obtain favorable votes from two-thirds of the seven-member Parole Board, but instead to obtain only two-thirds of those members of the Parole Board participating in a particular hearing. *See State v. Dingle,* 376 S.C. 643, 650, 659 S.E.2d 101, 105 (2008) ("As with any statute that is penal in nature, the Court must construe it strictly in favor of the defendant and against the State."); *Hair v. State,* 305 S.C. 77, 79, 406 S.E.2d 332, 334 (1991) (construing in favor of the defendant the different time frames for parole eligibility found in the general parole statute and in a statute regarding parole eligibility for burglary).

statute does not demonstrate the General Assembly's intent to frustrate the ability of a valid DPPPS quorum to execute the statutory duties of the department.

We agree with Appellant's contention that the interpretation advanced by DPPPS invites absurd results. For example, if the Parole Board reviewing the parole suitability of an inmate convicted of a violent crime consisted of only four members, a unanimous decision to grant parole would nonetheless result in a parole denial.[10] Essentially, the current DPPPS interpretation treats nonparticipating members of the Parole Board as "no" votes. DPPPS fails to present any authority for what is the illogical position that the General Assembly intended for non-participating Parole Board members to arbitrarily count against inmates convicted of a violent crime, or that the General Assembly intended for a meeting of the Parole Board convened with only a quorum to result in a continuous denial of parole to inmates convicted of a violent crime. Put another way, DPPPS fails to bring forward any rationale as to why absent Parole Board members could not just as well be treated as "yes," votes.[11]

---

**10.** The ALC observed that "there is no evidence that the [Parole Board] has ever even met with fewer than five members when considering the parole of an inmate convicted of a violent crime." However, the ALC observed that the Parole Board *could* meet with only four of the seven members. Regarding this hearing configuration the ALC determined:

> If a vote of only four members present ever took place in the case of an inmate convicted of a violent crime, the result would presumably be a denial of parole for that inmate, as the court in *James [v. S.C. Dep't of Prob., Parole, and Pardon Servs.*, 377 S.C. 564, 569, 660 S.E.2d 288, 291 (Ct.App.2008)] points out that though a two thirds majority of the full [Parole Board] is required to grant parole of a violent crime falling under section 16–1–60, there is no statutory requirement "that a certain number of board members ... be present in order to deny parole for someone convicted of a violent crime."

(alterations added). Thus, under the ALC's own interpretation of section 24–21–645, any hearing convened by a quorum of the Parole Board is an automatic denial of parole for an inmate convicted of a violent crime. The ALC erred in failing to recognize the legal infirmity of a statutory interpretation that even allowed the possibility that a simple meeting of a valid quorum of the Parole Board resulted in the automatic denial of an inmate's parole.

**11.** A hypothetical application of the Parole Board's interpretation to a wider context truly demonstrates its absurdity. For example, the South Carolina Constitution provides that "a majority of each house shall

The ALC erred in interpreting section 24–21–645's two-thirds provision to require Appellant to obtain five votes instead of four. The ALC's interpretation automatically views non-participating Parole Board members as "no" votes, and ignores the fact that Appellant obtained favorable votes from two-thirds of the Parole Board members participating in her hearing. This interpretation of section 24–21–645 is out of step with this Court's rules of statutory construction. Moreover, if the General Assembly intended for section 24–21–645 to require inmates convicted of a violent crime to obtain approval from two-thirds of the "full" Parole Board, the statute would contain language to that effect. Appellant obtained favorable votes from two-thirds of the Parole Board and should have been granted parole *even if* section 24–21–645 is applied retroactively.

## CONCLUSION

We hold that retroactive application of section 24–21–645 constitutes an *ex post facto* violation, and inmates convicted of a violent crime must only convince two-thirds of the Parole Board members participating in their hearing. Appellant received the requisite number of votes from the Parole Board, and thus, should be granted parole. Thus, we remand for proceedings consistent with this opinion. The ALC's decision is therefore,

**REVERSED.**

BEATTY and HEARN, JJ., concur.

PLEICONES, J., concurring in result in a separate opinion.

KITTREDGE, J., concurring in result in a separate opinion.

Justice PLEICONES.

I concur in result. I agree that "two-thirds of the members of the board" in § 24–21–645 means two-thirds of the members participating in the hearing. This interpretation of § 24–

---

constitute a quorum to do business." S.C. Const. art. III, § 11. The Parole Board's view of a quorum would treat those members of each house who are not present as "no" votes, effectively frustrating the ability of the quorum to act.

21–645 resolves the case before us. It has long been this Court's policy to decline to rule on constitutional issues unless they are essential to the disposition of the case. *Riverwoods, LLC v. County of Charleston,* 349 S.C. 378, 387, 563 S.E.2d 651, 656 (2002); *see also Sanders v. Anderson County,* 195 S.C. 171, 172, 10 S.E.2d 364, 364 (1940) ("The Court will avoid, when possible, passing upon the constitutionality of an Act of the Legislature...."). As a matter of judicial restraint, I would not reach the constitutional question, which is unnecessary to the decision. I therefore concur in result only.

Justice KITTREDGE.

I concur in result. I join the majority's construction of section 24–21–645 of the South Carolina Code, specifically as to the meaning of "two-thirds." Appellant received the requisite two-thirds approval and should be paroled.

I disagree, however, that the statutory change from a majority to two-thirds constitutes an *ex post facto* violation. I view the statutory amendment as merely a procedural change. *See, e.g., Alston v. Robinson,* 791 F.Supp. 569 (D.Md.1992) (finding statutory revision requiring a larger percentage of members of the parole board to approve prisoner leave, work release and parole was a procedural change that did not substantially alter prisoners' quantum of punishment, and therefore, its retroactive application did not violate the *Ex Post Facto* Clause); *Arizona ex rel. Gonzalez v. Superior Court,* 184 Ariz. 103, 907 P.2d 72, 74 (1995) (holding that the legislature's alteration of the vote requirement for parole does not violate *ex post facto* constitutional principles, for although it "may diminish [a prisoner's] ability to achieve parole," the amended statute does not affect the quantum of punishment and "has not newly criminalized his acts, enhanced his punishment, or altered the legal rules of evidence").